Moses DICKERSON et al.

v.

UNITED STATES STEEL
CORPORATION et al.

Civ. A. No. 73–1292.

United States District Court,
E. D. Pennsylvania.

July 25, 1977.

---

Prather G. Randle, Alice W. Ballard, Philadelphia, Pa., for plaintiffs.

Henry T. Reath, Duane, Morris & Heckscher, Philadelphia, Pa., S. G. Clark, Jr., Gen. Counsel, U. S. Steel Corp., Pittsburgh, Pa., Robert L. Weinberg, Julia Penny Clark, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

This long trial has now reached a critical stage. Plaintiffs, a class of black production-and-maintenance (P & M) workers at the Fairless Works of United States Steel (USS), have rested their case after 58 days of trial. The Court has before it a number of motions made at or near the end of trial, including a motion to involuntarily dismiss. The Court below outlines its decisions on these various issues and its holdings. Part of the plaintiffs' case is dismissed, and the required findings of facts and conclusions of law are incorporated in this memorandum opinion.

## DECERTIFICATION

Defendant U.S.S. has moved for decertification of the class action at this stage. This motion has been considered on a number of occasions, the most recent of these culminating in the Court's denial on May 19, 1977. U.S.S.' basis for again moving the Court to consider this issue is the recent decision in *East Texas Motor Freight System v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). In light of this Court's most recent ruling denying this motion, the Court will now only discuss what impact, if any, the *Rodriguez* opinion has on certification in this case.

■ Defendant argues that *Rodriguez* requires that all members of the class must have the "same injury" as the class representative. Although the Court agrees with this statement of law in general, the strict interpretation which the defendant urges cannot be accepted. Defendant in essence proposes that, in order to allow an action under Rule 23(b)(2), each class member must be virtually interchangeable, with each individual having factually identical claims to that of the named representative. This would virtually eliminate most class actions of employment discrimination. This Court sees nothing in the *Rodriguez* opinion which demands such a drastic limitation on class actions.

The High Court's primary concern in *Rodriguez* was not with the similarity of claims among the class members, but with the adequacy of the named representatives. The Justices held that the circuit court erred in certifying a class when it was already established that the named plaintiffs had suffered no injury whatsoever. That is not the situation in the case at bar. At the time of certification, the two named plaintiffs were actively pursuing not only remedies for injuries to the class, but also for injuries they claimed to have sustained. Therefore under *Rodriguez*, they would be proper and adequate representatives.

■ Defendant claims that decertification is required if the named plaintiffs fail to prove their individual claims. *Rodriguez* states to the contrary.

"Obviously, a different case would be presented if the District Court had certified a class and only later had it appeared that the named plaintiffs were not class members or were otherwise inappropriate class representatives. In such a case, the class claims would have already been tried, and provided the initial certifica-

tion was proper and decertification not appropriate, the claims of the class members would not need to be mooted or destroyed because subsequent events had undermined the named plaintiffs' individual claims." *Rodriguez*, 431 U.S. at 406, n. 12, 97 S.Ct. at 1898.

Thus, since the class claims have already been presented *in toto* by the plaintiffs, any failure of the named representatives' prima facie case or in the final adjudication will not affect the propriety of proceeding with this as a class action. Since the class was properly certified before, and the class claims have been presented to the Court, the motion to decertify is denied.

## SUMMARY JUDGMENT

Defendant United Steelworkers of America and its locals ("the union") have filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6), or in the alternative, for summary judgment under Fed.R.Civ.P. 56. Upon consideration of all the briefs and the evidence presented at trial, the Court has decided to deny these motions.

▮ At this stage of the proceedings, with the Court considering evidence outside the pleadings, a 12(b)(6) motion should be treated as one for summary judgment. Fed.R.Civ.P. 12(c); *United States v. Lewisburg Area Schools*, 539 F.2d 301 (3d Cir. 1976). Therefore, in effect the Court has only a Rule 56 motion before it. The Court, in considering such a motion, may not resolve issues of credibility or fact; if material fact issues are in dispute, summary judgment is not appropriate. *Lockhart v. Hoenstine,* 411 F.2d 455 (3d Cir. 1969), *cert. denied,* 396 U.S. 941, 90 S.Ct. 378, 24 L.Ed.2d 244 (1969). Summary judgment is only allowed when the law clearly requires it. The proceedings in this case have been governed by the provisions of a pretrial order, (Pretrial Order No. 3), signed by the Court on November 18, 1976. Section 1 of that order required plaintiffs to state in their pretrial statement "the theory of their case,

including a statement of claims, issues of contentions, regarding the specific acts or practices of each defendant which plaintiffs claim have discriminated against the plaintiff class and/or the individual plaintiffs . . . (and) the legal bases and legal authorities supporting the theory of the case set forth . . ." Therefore, the Court must look to the pretrial statement, known as the "Red Book," to decide what are the allegations being made against the union.

▮ In their pretrial statement, four claims are asserted against the union. Three of these claims essentially assert that the Union is vicariously liable for the employer's acts.[1] Under Title VII, it is illegal for a labor union to "cause or attempt to cause an employer to discriminate . ." 42 U.S.C. § 2000e–2(c). The basis of the plaintiffs' claim is that the "cause" of the employer's action is the union's failure to bargain away the practices complained of. This is a claim then of "omission" and not "commission." Many courts considering this general question have sustained such a Title VII claim, but in varying ways. In *Macklin v. Spector Freight Systems, Inc.,* 156 U.S.App.D.C. 69, 478 F.2d 979 (1973), the Court pointed out that a union has a duty to protect its members from discrimination, first established by *Steele v. Louisville & Nashville R. Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). "Where blacks are in a minority, as they so often are in large industrial unions . . ., tacit union acquiescence in an employer's discrimination effectively produces the same end result that was condemned in *Steele.*" 478 F.2d at 989. Furthermore, the union has a responsibility to negotiate for non-discriminatory treatment.

"Where a union has not done so and where there is such solid evidence of employer discrimination as is alleged here, it would undermine Title VII's attempt to impose responsibility on both unions and

---

1. *For purposes of this motion, the Court is assuming that all claims against U.S.S. will be established, since the Court is required to view the facts as most favorable to the non-moving* party. However, since some claims are dismissed later in this memorandum under Fed.R. Civ.P. 41(b), the union will eventually receive the benefit of that ruling.

employers to hold that union passivity at the negotiating table in such circumstances cannot constitute a violation of the Act." *Id.*

In *Hairston v. McLean Trucking Co.,* 62 F.R.D. 642 (M.D.N.C.1974), *vacated on other grounds,* 520 F.2d 226 (4th Cir. 1975) the court there faced a similar situation, where the discriminatory act arose upon hiring. There was no evidence, as there is none here, that the union controlled or participated in the hiring process. The court held the local union liable for one-third of the attorneys' fees and costs.

> "The Court has done this because it feels that Local 391, by its acquiescence, shares a part of the blame in discriminating against plaintiffs. While Local 391 took no affirmative action in discriminating, it certainly knew of the companies' actions and encouraged such by its own inactions . . . Local 391 plays an important role in the employment situation at MAS and McLean by representing the plaintiffs. The Court feels that its decision will serve to promote the policy and purposes of the Civil Rights Act of 1964 by encouraging those who have the power to stop discrimination to use that position." 62 F.R.D. at 673.

Other cases [2] which hold the union liable for "acquiescing" in acts found to be discriminatory have been decided by the Courts of Appeals for the Fifth and Sixth Circuits.[3] Since the Court has decided to follow this rule, summary judgment on these three claimed areas of discrimination—transfer, initial assignment and discipline—must be denied.

The union argues that it cannot be held liable for acts of the employer in light of the decision in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97

S.Ct. 1843, 52 L.Ed.2d 396 (1977). That case held that a seniority system could not be held illegal under Title VII since it was protected by § 703(h) of the Act, 42 U.S.C. § 2000e–2(h). Therefore, the Supreme Court held that "the union's conduct in agreeing to and maintaining the system did not violate Title VII." 431 U.S. at 356, 97 S.Ct. at 1865. The Justices ordered that the injunction against the union be vacated.

Defendant claims that the Supreme Court's release of the union in *Teamsters* impliedly rejects any theory that the union was liable for any other illegalities that might be contained in the collective bargaining agreement or done with its acquiescence. The Court does not read *Teamsters* as eliminating the union's liability. On the contrary, the implication of that decision, where the only claim of union liability was based on its agreement as to the seniority system, was that the union would have been liable but for the exclusion by § 703(h). In the case at bar, where many of the claims are outside the protection of that provision, the union cannot so simply escape liability for agreeing to and maintaining any other practices found to be illegal.

▮ The final claim—discrimination in grievance process—requires the Court to make factual determinations on material issues. Its decision is not, therefore, appropriate under a Rule 12(b) motion or a Rule 56 request, but will be considered below under the motion for involuntary dismissal.

## RULE 41(b) AND PRIMA FACIE CASE

▮ Defendants have moved under Fed. R.Civ.P. 41(b) to dismiss this action at this stage, which is at the close of the plaintiffs' case-in-chief. In order to defeat the plaintiffs' claims at this stage defendants must first show that plaintiffs have failed to

---

**2.** *Johnson v. Goodyear Tire and Rubber Co.,* 491 F.2d 1364 (5th Cir. 1974); *EEOC v. Detroit Edison Co.,* 515 F.2d 301 (6th Cir. 1975); See also *United States v. Bethlehem Steel Corp.,* 312 F.Supp. 977 (W.D.N.Y.) rev'd in part on other grounds, 446 F.2d 652 (2d Cir. 1971); cf. *Robinson v. Lorillard,* 444 F.2d 791 (4th Cir. 1971).

**3.** Even though the union's liability in some of these cases was based on acquiescence to a seniority system that operated illegally, which can no longer be held violative of Title VII under *International Brotherhood of Teamsters v. U. S.,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Court still finds their general teachings on unions' responsibilities to negotiate to be relevant.

make out a prima facie case of discrimination. If the plaintiffs have failed to meet this level of proof, the claim, whether class or individual, will be dismissed. However, if the plaintiffs meet this burden, the Court must then examine the evidence and decide if "upon the facts and the law the plaintiff has shown no right to relief." Rule 41(b). In deciding this, the Court need not view the evidence in a manner most favorable to the plaintiff, but instead must weigh it, deciding issues of fact and credibility. *James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266 (7th Cir. 1976). Therefore, in deciding this motion, the Court has considered the evidence brought out by cross-examination as well as by direct. Some of this evidence has discredited the prima facie case. In this manner the Court has decided, on each claim, whether the plaintiffs have established a prima facie right to relief, or whether the claim should be dismissed for failure of proof. The standards for this initial level of proof vary with the statute under which the claims have been made. The Court will therefore discuss each statute separately.

Under Title VII, a prima facie case can be established in a number of ways. For a class action, for example, gross statistical disparities alone may constitute prima facie proof of a pattern or practice of discrimination. *Hazelwood School District v. United States,* —— U.S. ——, 97 S.Ct. 2736, 52 L.Ed.2d 768 (1977). *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). This method is discussed below in greater detail. In an individual action, one method of proving a prima facie case was outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). That case held that discrimination can be established if it is shown:

"(i) that (an individual) belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802, 93 S.Ct. at 1824.

These two methods of proof have received explicit approval by the Supreme Court. The differences in class and individual proof will be discussed further below. However, they are not the only tests by which a court may judge if a plaintiff or class of plaintiffs has established a prima facie case of discrimination. In *Teamsters,* the High Court noted that it had not "purport(ed) to create an inflexible formulation." 431 U.S. at 358, 97 S.Ct. at 1866. There, the Court said: "The importance of *McDonnell Douglas* lies not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Id.* Therefore, this Court has analyzed these cases to decide how plaintiffs must establish an inference of discrimination for class or individual cases. The shared element in these methods of proof is that each requires a plaintiff to show a disparity, or difference, in his condition as compared to that of non-minority individuals. Therefore, in order to meet this initial burden, the plaintiff must show such a disparity in treatment or status.

As the Supreme Court noted in *Teamsters,* 431 U.S. at 324, n. 15, 97 S.Ct. at 1854, there are two types of disparities which are recognized as discriminatory. That opinion succinctly defined the first, disparate treatment: "The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin." *Id.* The second type of claim, disparate impact, involves "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* See also *Dothard v. Rawlinson,* —— U.S. ——, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). The plaintiffs have made both types of claims in this case.

■ In order to meet this basic test of "disparity" for the class action, plaintiffs must show, in some way, that blacks are either treated differently or are affected differently than other persons at Fairless Hills. It does not meet this test to show that blacks received unfair treatment or affect unless, in some way, that this was different from that received by whites. If there is no evidence of whites being treated or affected differently, on a plant-wide basis, then plaintiffs have not met this test. In the same way, unless some evidence[4] is shown of disparity of impact or treatment between the black class member and whites, the testimony does not establish a discrete event of discrimination.[5]

■ As this Court has noted in its opinion in *Croker v. Boeing Co. (Vertol Division)*, 437 F.Supp. 1138 at 1182 (E.D.Pa. 1977), "once the plaintiff has presented a prima facie case of discrimination, the burden shifts to the defendant to rebut the inference of discrimination." So far in this case, defendants have defended by cross-examination. They have challenged the accuracy and appropriateness of the statistical studies and analyses and attempted to impeach witnesses' testimony. To the extent that these efforts have been successful, the discredited record evidence will not be considered as part of the plaintiffs' prima facie case. If the plaintiffs meet their initial burden, defendants may defeat this showing by justifying any disparity as a result of business necessity. *Croker, supra.* Under Title VII, courts have guaranteed a specific order of proof, which requires that plaintiffs be allowed to put on rebuttal testimony to overcome defendants' showing of business necessity. See *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Therefore, consideration of any of defendants' business necessity defenses established by cross-examination must be postponed until plaintiffs are allowed to put on a rebuttal case. At this time, therefore, any part of the plaintiffs' case not impeached as to credibility or accuracy will be allowed to remain.

■ The plaintiffs have presented both class claims and individual claims. As noted above, *McDonnell Douglas* enunciated one test of the individual's prima facie case. However, proof of a class-wide claim is somewhat more involved. In *Teamsters,* the Supreme Court said that plaintiffs in a class action "ultimately (have) to prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." They must show "that racial discrimination (is) the company's standard operating procedure—the regular rather than the unusual." 431 U.S. at 336, 97 S.Ct. 1855. Therefore, plaintiffs must show something more than a small number of discriminatory incidents affecting a few members of the class.

■ One of the most effective means of showing the existence of a policy of discrimination is by use of statistics. In its recent pronouncements, the Supreme Court has repeatedly endorsed this method of

---

4. This does not mean that, within the bounds of each individual's testimony, that individual must show that a white was treated or impacted differently from him. Defendant USS has argued that each witness must prove a "white mirror" in order to establish that he was a victim of discrimination. This argument must be rejected. Even if an individual cannot point to a specific non-black receiving different treatment or impact, the Court may infer disparity if a general pattern and practice of discrimination is found on that claim. Of course, if no discriminatory practice is established on a class-wide basis, there must be in the record, when viewed as a whole, some evidence of disparity as to the individual and his claim. Therefore, if disparity is shown either on a class-wide or individual basis, an individual class member has satisfied his prima facie case.

5. A "discrete" event is one which establishes that a class member has been discriminated against. Such events may buttress the plaintiffs' charge of class-wide discrimination. See *Hazelwood School District v. United States,* —— U.S. ——, ——, 97 S.Ct. 2736, 53 L.Ed.2d 768; *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396. In addition, any individual found to have been discriminated against may recover independent of the fate of the class' case. See *Croker v. Boeing Co. (Vertol Division),* 437 F.Supp. 1138 (E.D.Pa. 1977); *United States v. Hazelwood School District,* 534 F.2d 805, 819–820 (8th Cir. 1976).

proof. In *Teamsters,* the government compared the percentage of minority employees in the company's total employ to the percentage in the higher-paying jobs.[6] This disparity, coupled with testimony of individuals who "brought the cold numbers convincingly to life," was found to constitute prima facie proof. The Court referred to a number of its earlier decisions in which statistical analyses played an important role, such as *Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974) and *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). "Statistics are equally competent in proving employment discrimination." 431 U.S. at 339, 97 S.Ct. at 1856. One reason statistics are becoming increasingly important is that " '(i)n many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer or union involved.' " 431 U.S. at 339, n. 20, 97 S.Ct. at 1857, *quoting United States v. Ironworkers Local 86,* 443 F.2d 544, 551 (9th Cir. 1971).

About one month after the *Teamsters* decision, the Court handed down *Dothard* and *Hazelwood.* Both of these cases turned on the use of statistics.[7] In *Hazelwood,* the Court held that properly presented statistics could constitute a prima facie case. In *Dothard,* the disparate impact of an employment policy was shown on the basis of numbers alone. "The plaintiffs in a case such as this are not required to exhaust every possible source of evidence, if the evidence actually presented on its face conspicuously demonstrates a job requirement's grossly discriminatory impact." —— U.S. at ——, 97 S.Ct. at 2727.[8]

However, as the Court noted in *Teamsters,*

"statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all the surrounding facts and circumstances." 431 U.S. at 339, 97 S.Ct. at 1856.

In *Hazelwood,* the Justices rejected the district court's use of statistical comparisons. Therefore, although this Court accepts in theory the use of statistics in a Title VII case, it must analyze the propriety of the particular method used before considering it as probative evidence.

Under 42 U.S.C. § 1981, this Court has held that an essential element of plaintiffs' proof is discriminatory intent or purpose. *Croker,* at 1181, *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).[9] Intent may be inferred from a statistical disparity, *Teamsters,* 431 U.S. at 335, n. 15, 97 S.Ct. 1843, although most cases have held that such disparities must be dramatic in order to make such an inference on statistics alone, *Croker, supra.* If lesser disparities are found, "further inquiry into historical background, specific events and other indicia of intent is necessary." *Croker,* at 1182. Therefore, if the Court finds that a disparity exists on any claim of an individual or the class, in order to hold that the plaintiffs' burden is met, a further finding must be found as to defendants' motive or purpose.

**6.** Of the total employees in *Teamsters,* 5% were black and 4% Hispanic. However, the highly-desired line drive jobs were 0.4% black and 0.3% Hispanic. The lower-paying jobs were held by 83% of the blacks and 78% of the Hispanics employed, while only 39% of the non-minorities were employed in this lower echelon. 431 U.S. at 336, 97 S.Ct. 1843.

**7.** In *Hazelwood,* the government's case consisted of four elements, all of which plaintiffs in the instant case have attempted to prove: (1) a history of alleged racially discriminatory practices, 2) statistical disparities, 3) standardless and largely subjective employment procedures and 4) specific instances of alleged discrimination against class members. *Hazelwood School District v. United States,* —— U.S. ——, ——, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

**8.** The Third Circuit has also embraced the use of statistics in a Title VII suit. "(S)tatistics are particularly appropriate in Title VII class actions where it is the aggregate effect of a company's policy on the class which is important." *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3d Cir. 1975), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

**9.** As this Court held in *Croker,* intent is not needed under Title VII.

█ Finally, plaintiffs have made claims under § 1985(3), the civil rights conspiracy statute. That statute, on its face, requires proof of general intent. The statute states (emphasis added):

"If two or more persons conspire . . *for the purpose of* depriving, either indirectly or directly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . ."

there is a basis for a civil action. In *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Court noted that § 1985(3) requires that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." The Justices concluded: "The conspiracy, in other words, must aim at a deprivation of the equal employment. of rights secured by law to all." 403 U.S. at 103, 91 S.Ct. at 1798. In light of this, read with *Washington v. Davis, supra,* it is clear that the specific intent requirement of § 1981 applies with equal force under § 1985(3).

Clearly, the second most important element of this cause of action is proof of a conspiracy. Under *Griffin,* the law clearly reaches conspiracies between private individuals. In *Lohr v. Association of Catholic Teachers, Local 1776,* 416 F.Supp. 619 (E.D. Pa.1976) Judge Hannum considered a case in which the union was being held liable on the basis of illegal disbursement of funds collected under the collective bargaining agreement. Since the agreement itself was not illegal, the employer was not liable for the union's acts not pertaining to the agreement. The employer's knowledge of the illegal use of the money was not a basis for conspiracy. He referred to *Byrd v. Local Union No. 24,* 375 F.Supp. 545, 563 (D.Md. 1974), which said that alleged co-conspirators "must have agreed, expressly or impliedly, with one or more entities to inflict a wrong or injury upon another."

█ It is clear that if this Court finds provisions of the written agreements between USS and the union to be illegal that a conspiracy may be found. However, this Court also believes that a party who acquiesces in illegal behavior which could be regulated by contract, either by not pressing for change in the contract or not complaining about an apparent disregard of its provisions, has impliedly entered into a conspiracy. These actions would constitute more than those of the employer in *Lohr,* who merely was aware of illegal activity, but did not possess the means to affect it. If a party has the potential to stop illegal activity but fails to act to do so, and sits idly by, then that party may be said to have impliedly conspired in such illegalities.

## JURISDICTION AND STATUTE OF LIMITATIONS

The Court must first define the extent of its jurisdiction under the applicable statutes, 42 U.S.C. §§ 1981, 1985(3) and 2000e *et seq.* The Court first finds defendant USS is a corporation doing business in the Commonwealth of Pennsylvania. It owns, operates and maintains facilities in Fairless Hills, Pennsylvania. USS is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b) and is engaged in an industry affecting commerce. Defendant union, United Steelworkers of America (AFL–CIO) and its locals are labor organizations within the meaning of the Act and are engaged in an industry affecting commerce. The locals represent employees at the USS plant at Fairless Hills, Pennsylvania.

This case is being brought as a class action under Fed.R.Civ.P. 23(b)(2). On August 21, 1976, this Court defined the class to consist of:

"a. All blacks now employed or who might be employed in the future as hourly Production and Maintenance employees by United States Steel Corporation at its Fairless Hills Plant, Fairless Hills, Pennsylvania; and all blacks who were employed as hourly Production and Maintenance employees by the Company from July 2, 1965, to the present date, but who are no longer employed there;

"b. All blacks within the class identified in sub-paragraph (a) who are represented, or who might be represented in the future by defendant labor organizations at the Fairless Hills Plant, Fairless Hills, Pennsylvania; and all blacks within the class identified in sub-paragraph (a) who were represented by defendant labor organizations at the Fairless Hills Plant from July 2, 1965, to the present date."

■ There are at present two class representatives, Moses Dickerson and Eddie Williams. In a class action, the named plaintiffs can represent all persons who could have filed charges with the Equal Employment Opportunity Commission (EEOC) as of the effective date of a class representative's filing. *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 246 (3d Cir. 1975); *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). The plaintiffs argue that although no charge was filed with the EEOC until October 27, 1971, equitable principles mandate that the filing date should be deemed to have been earlier.

■ Plaintiffs argue that in March of 1970, Moses Dickerson filed a complaint with the Department of Labor. They contend that since he was not referred to the EEOC as the proper agency, that filing should be held to be a filing with the EEOC under equity. Defendants argue that because filing with the EEOC is a jurisdictional prerequisite, *Wetzel, supra*, it must be strictly construed. The Court has decided, after reviewing the case law, that the plaintiffs' position must prevail.

Dickerson was hired in November, 1969. In March of 1970 he wrote to the federal Department of Labor concerning his complaints about USS. (N.T. 8255). On February 1, 1971, Dickerson and Williams wrote again to Labor, inquiring as to the status of their case. The letter, P-3074, refers to

Labor's response to their initial complaint, which they received in November, 1970. The reply letter from Labor dated March 25, 1971, also supports Dickerson's claim that P-3074 was his second letter to Labor. Therefore, the Court accepts Dickerson's statement that he filed a written complaint on March of 1970 and will adopt March 31, 1970 as the date of filing. This will give maximum benefit of doubt to defendant.

"Courts have continuously construed Title VII so as not to allow procedural technicalities to bar a claim under the Act." *Wetzel v. Liberty Mutual Insurance Co.*, 511 F.2d 199, 202 (3d Cir. 1975). As the Third Circuit noted, initial complaints under the Act are filed by laymen, not familiar with the bureaucratic maze of federal agencies. See *Love v. Pullman*, 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972), "Were we to interpret the statute's procedural prerequisites stringently, the ultimate result would be to shield illegal discrimination from the reach of the Act." *Egelston v. State University College at Geneseo*, 535 F.2d 752 (2d Cir. 1976).

It is for these reasons that other courts have held that filing with the Labor Department is the equitable equivalent of filing with the EEOC. *Egelston, supra*; *EEOC v. Collator Corp.*, 8 E.P.D. paragraph 9481 (9th Cir. 1974); *EEOC v. Nicholson File Co.*, 408 F.Supp. 229 (D.Conn.1976); *EEOC v. Delaware Trust Co.*, 416 F.Supp. 1040 (D.Del.1976). The *Delaware Trust* case, decided by a district court in this circuit, has many of the elements found in the instant case. There, plaintiff had attempted to write the EEOC but her letter was returned. She then wrote to the Labor Department, which only forwarded her letter to the local EEOC four months later. Dickerson first went to the New Jersey Department of Labor, which referred him to the federal office. He contacted the office as well as the Pennsylvania Human Relations Commission, where another formal complaint was filed.[10]

---

**10.** Plaintiffs also cite Judge Fullam's opinion in *Sutherland v. S.K.F. Industries*, 419 F.Supp. 610 (E.D.Pa.1976). In that case, plaintiff had

filed with the Labor Department, who had failed to inform her that a state agency filing was a jurisdictional requirement. Under the

Defendants argue that *International Union of Electrical Workers v. Robbins & Myers*, 425 U.S. 950, 96 S.Ct. 1723, 48 L.Ed.2d 193 (1976), requires that all jurisdictional prerequisites be strictly construed. That is not the teaching of the case. That case held that the filing of a grievance in the contractual system did not toll the statute of limitations. The Justices contrasted the situation with *Burnett v. New York Central R.R.*, 380 U.S. 424, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965), where an FELA plaintiff filed in the wrong court and his actions was dismissed. The filing was sufficient to toll the statute since he asserted the same statutory claim in state and federal courts, the Court held. In *Robbins & Myers*, the Court noted a grievant asserted a contract-based claim, while a Title VII litigant pressed a statutory claim. Therefore, the filing of one did not affect the other.

■ This Court holds that *Burnett* and *Robbins & Myers* require that equitable tolling principles must be applied. As in *Burnett*, plaintiff was prevented from asserting his rights before the EEOC because the Labor officials never informed him that he was before the wrong agency. The question posed by Judge Schwartz in Delaware applies here: "Can bureaucratic ineptitude defeat an aggrieved lay person's diligent attempts to file a charge of [employment discrimination] with the federal Equal Employment Opportunity Commission?" Since the cases mandate that the answer is "no," this Court will consider March 31, 1970 as the filing of a charge against USS. Therefore, any class member claim which arose after October 2, 1969, can be considered under Title VII.[11]

■ In view of the fact that no evidence was introduced at trial to show that the

Labor Department complaint contained charges against the union, this date will not relate to claims against the union. Eddie Williams' EEOC charge, dated in October 27, 1971, will establish the class claim date against the union of May 1, 1971.

■ As this Court has previously held in *Dupree v. Hertz*, 419 F.Supp. 764 (E.D.Pa. 1976), the statute of limitations under § 1981 is six years. This limitation, discussed fully in *Croker, supra* at 1179–1181, will result in the Court considering all claims under this statute arising after June 11, 1967.

Since all jurisdictional prerequisites have been met, the Court concludes that it has jurisdiction of this case under 42 U.S.C. §§ 1981, 1985(3) and 2000e *et seq.*

■ Having established the relevant date for the tolling of the statute of limitations, this Court must now decide what evidence or claims must be excluded. Plaintiffs have argued that discriminatory incidents occurring prior to the time period included by the statute can still serve as a basis for liability if "locked-in" by a racially neutral practice. This Court previously had accepted this theory, since it had been embraced by most circuits. See Memorandum Opinion, *Dickerson v. United States Steel*, C.A. No. 73–1292 (E.D.Pa. February 28, 1977). However, that opinion noted that the Supreme Court was presently reviewing cases that might alter the opinion. That contingency has now come to pass. The opinion in *United Air Lines v. Evans*, 431 U.S. 324, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) holds that acts not made the basis of timely charges cannot be the basis of any liability, even if the effects are continuing because of a racially neutral practice.[12]

---

Age Discrimination in Employment Act, 42 U.S.C. § 6101 et seq., Judge Fullam concluded that although the state filing was a prerequisite to his jurisdiction, "equitable considerations in the case at bar convince us that plaintiff should be relieved from the consequences of his neglect in this regard." 419 F.Supp. at 613.

11. Since the Dickerson claim was pending before the EEOC at the time of the 1972 amendments to Title VII, class members may use the 180 days as the relevant limitations period.

*International Union of Electrical Workers v. Robbins & Myers*, 425 U.S. 950, 96 S.Ct. 1723, 48 L.Ed.2d 193 (1976).

12. Of course in this case, the actions of Moses Dickerson and Eddie Williams have established the legal validity for the entire class. Each class member with a claim arising within the above-described statute of limitations period is allowed to benefit from their satisfaction of jurisdictional requirements, and need not have filed a separate charge.

The Justices said that such a charge is the legal equivalent of a pre-Act discriminatory incident. "It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." 431 U.S. at 558, 97 S.Ct. at 1889. Therefore, it is clear to this Court that any action, not within the statute of limitations period established for the class, cannot serve as a basis of liability, whether it be pre-Act or post-Act.

Plaintiffs argue that *Evans* and *Teamsters, supra,* read together, do not disallow their "lock-in" theory altogether, but merely limit it. They claim that these decisions hold only that a bona fide seniority system cannot be attacked as illegal if its effect is to perpetuate prior discrimination. This Court cannot agree, for these opinions say more than that. *Evans* is based on two separate grounds. First, the Court holds that a prior discriminatory act cannot be a basis of liability if the individual failed to file a charge under § 706(d), 42 U.S.C. § 2000e–5(d), even if its effects are continuing. This opinion clearly holds that the statute of limitations is an absolute bar and that it cannot be circumvented by "lock-in." A second and independent holding said that such a past event may not serve as a basis for a present challenge to a neutral seniority system which is immunized by § 703(h), 42 U.S.C. § 2000e–2(h).

■ Plaintiffs look to *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) to keep their "lock-in" theory viable. There, the Supreme Court said that non-job-related entrance requirements could not be allowed, even if facially neutral, if they operated to effectively close out minorities. "Under the Act, practices, procedures or neutral test on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." 401 U.S. at 430, 91 S.Ct. at 853. The "prior" practices in the *Griggs* case occurred prior to Title VII. It appears

that *Evans* puts a limiting gloss on the word "prior." However, even if in *Teamsters* the Supreme Court intended to keep this "lock-in" theory available for practices other than those attached to a seniority system, the plaintiffs still have not made a proper case. As pointed out below, in the discussion of transfer policies, those factors which may " 'freeze' the status quo" in the instant case are part and parcel of the seniority system, and thus cannot be a basis of liability, as in *Teamsters.* Those few practices which are separate from it cannot be said to be independent and overriding "lock-in" factors. In this case, apart from the seniority system, there is no practice strong enough to perpetuate any alleged past discrimination as to all class members. See *Teamsters, supra.*

The "lock-in" theory may still be used to show that present neutral practices illegally affect blacks more than whites. This is what is known as the "disparate impact" theory, discussed *infra.* The "disparate impact" theory allows plaintiffs to attack any policy, even if facially neutral (except seniority systems), as violative of Title VII. An example of such a practice, although not the only one, is the use of qualifying tests or other hiring criteria which bear no relation to business necessity. See *Griggs, supra.* Another example, recently discussed in *Dothard, supra,* is a height-and-weight requirement for guards which disparately excludes women. All that *Teamsters* and *Evans* do to this approach is to bar attacks on a legitimate seniority system, no matter how disparate its impact. Otherwise, a facially neutral practice can be violative of Title VII if its impact is disparate on different groups. However, this Court believes the "disparate impact" theory cannot be used to revive past acts which are otherwise beyond the law. In this opinion, because of the failure of plaintiffs' "lock-in" theory, the Court has not found either defendant liable for any incident occurring outside the statute of limitations period.

## CLASS CLAIMS DISMISSED

The Court will first discuss the class claims which will be dismissed under the 41(b) motion. There are six areas of claimed discrimination outlined in the Red Book upon which plaintiffs have failed to establish a class-wide prima facie case. They are: transfer (in part), harassment and discipline, "racially discriminatory atmosphere," grievance processing, hiring, and implementation of the consent decree. Each of these areas will be discussed at length below, with the findings of facts and conclusions of law incorporated into the discussion.

### Transfer

█ Plaintiffs have made a number of attacks on transfer policies at Fairless. All but one of these fail, partially in fact and partially on the law. Since the law has changed drastically since this case was instituted, plaintiffs' claims in this area have been shifting.

Originally plaintiffs have two claims. First, they argued that the seniority system contained disincentives to transfer that resulted in freezing blacks into their discriminatory initial assignments. The *Teamsters* decision, which held seniority systems immune under § 703(h) of Title VII, eliminated that argument. Secondly, they contended that the system of interviewer discretion at Fairless [13] resulted in illegal treatment of blacks in transferring. This second argument has been retained, and with some additions and deletions, is now the plaintiffs' major "lock-in" claim. It must be dismissed for failure of proof.

█ This argument now has two dimensions—disparate treatment and disparate impact. The class-wide proof of disparate treatment, however, has not been present-ed. A number of witnesses testified that their requests for transfer had been denied. Well over half of these recitations did not establish a prima facie case of discrimination. More than that number testified that their transfer requests had been granted. Plaintiffs presented no statistical evidence that blacks had been denied transfers at any greater rate than whites. Indeed, the only class-wide data presented, Appendix J, shows that the black and white transfer rates are not significantly different. Therefore, there is no basis on which to infer a practice of discrimination in treatment. The only evidence which would even suggest that discrimination was possible is the discretionary method of awarding transfers. Yet a discretionary system, with no evidence of pervasive abuse, cannot support a class claim of disparate treatment. The individual claims dismissed are analyzed later in this memorandum.

However, plaintiffs have attempted to show that this system has a disparate impact. Plaintiffs try to argue from the fact that the system requires a formal written application and places great discretion in the interviewers and the evidence of a low (2½% per annum) transfer rate that Fairless has an unwritten "no-transfer" rule. This cannot be shown by the evidence. Transfers are allowed, but the testimony shows that many employees do not seek them. There are many disincentives to transfer which may inhibit persons from applying to transfer. Most notable of these disincentives is the seniority system itself, which was the plaintiffs' original target. Once an employee had accumulated seniority (prior to 1974) he lost it and all its protections if he transferred. This is the most significant disincentive to transfer, but cannot be attacked under Title VII.

---

**13.** In order to transfer at Fairless within a bargaining unit but between seniority units, an employee must file a written application. This application is race-coded and filed according to the department requested. When a general supervisor files a manpower requisition, the interviewers are supposed to check to see if any requests have been filed to transfer to those positions. The labor agreements require that employees with a specified length of plant service (ranging from two years to six months) be considered before new hires. No specified requirements for jobs are promulgated to govern the interviewers' discretion in selecting persons for transfer. This system has the same potential for discrimination as does the initial assignment system, *infra.*

Plaintiffs have been unable to carry their burden of proof, for having demonstrated that the seniority system is a significant disincentive to transfer, they have defeated their own case. The Court is not convinced that the formal requirements for transfer pose a greater disincentive to transfer than the loss of seniority.[14] Also, the plaintiffs have not demonstrated a causal connection between the discretion in interviewers and the rate of transfer.

Second, plaintiffs contend that this unwritten no-transfer rule is brought about by the lack of plant-wide posting requirements. Although this contention is at least borne out by some witnesses' testimony,[15] it is still not convincing. Under the procedures, transfer applicants need not wait for an opening to occur. At any time, an employee may file an application for transfer which will remain active for one year. Under the LSA, e. g. Section E–9 of the 1971 agreement, these transfer applicants are to be considered for jobs as they become open. Jobs need not be posted in order for employees to apply.

This practice seems to work more often than not. At trial, a total of 44 individuals mentioned attempts to transfer. Of these, 18 were successful in their transfers. The Court cannot assume that, in light of the obviously biased nature of this "sample," Fairless' transfer system is not generally implemented correctly. Plaintiffs have failed to show that potential transferees were inhibited by the lack of plant-wide posting instead of by the seniority provisions. Other systems, such as the personnel office's file and the informal employee grape-vine evidenced by testimony, operate to effectively make job opportunities widely known.

The plaintiffs' second attack on the transfer policies at Fairless is the exemption of the new facilities from seniority requirements. Since this is an explicit exemption to the seniority system, it cannot be immunized by § 703(h). This policy, unlike the other transfer policies, has resulted in a disparate impact. The new unit first crews are not bid on a basis of seniority. Under a memorandum of understanding, USS is given broad discretion in picking these crews. At Fairless, this discretion has resulted in all-white first crews, while blacks are allowed only on the second and third crews.[16] The memorandum of understanding virtually obliterates all transfer rights which provide some measure of protection to minority workers. Carl K. Smith and Benjamin Williams are examples of this problem. Both lost bids to be on a first crew in 1968; junior whites were awarded the jobs.

In light of this evidence, the Court has decided not to dismiss this claim of transfer discrimination against USS under both Title VII and § 1981. Furthermore, in light of the union's obvious participation in the memorandum of understanding, the claims against the union will also be retained. In addition, the claim under § 1985(3) will also be retained.

Finally, the plaintiffs contend that the no-transfer rule between bargaining units operates to "lock-in" employees. They acknowledge that this agreement is an integral part of the seniority system, yet challenge its "bona fide." Their argument, that any system which clearly operates to separate all-white units (in this case guards, clerical and technical, etc.) from heavily-black units (P & M) cannot be bona fide under § 703(h), is rejected by the *Teamsters* opinion. The system here is the same as in *Teamsters*, where one bargaining unit was

---

14. For example, William Roberts testified that he decided not to transfer when he had amassed seniority in his unit dating back to 1953 because he would have to start over as a laborer. Marvin Lee Hayes stated that he wanted to become a painter, but he did not attempt to transfer because he wanted to secure his job.

15. See, e. g., testimony of Emmanuel Edmondson (no crafts jobs posted until 1971), George A. Smith (no clerical openings posted in mill).

16. The first crew has the ranking seniority on all jobs; members of later crews fill in jobs at lower levels, but can never catch up with the first crew members. Thus, these jobs are among the most sought-after in the plant.

all-white. In each case, transferees across bargaining units would lose all seniority. A bona fide system is one that "applies equally to all race and ethnic groups." 431 U.S. at 355, 97 S.Ct. at 1865. Plaintiffs have not presented any evidence that the practice of maintaining the separate units is not "rational, (and) in accord with the industry practice . . .." *Ibid.* Therefore, the Court must hold that this no-transfer rule is protected by § 703(h), in that this is part of a bona fide system.

█ Plaintiffs have argued that seniority systems may still be attacked under § 1981. However, that section, as noted above and in *Croker*, now requires proof of intent in order to make a prima facie case. Any system protected by § 703(h) would not have been formulated or implemented with this requisite intent or it would not be considered bona fide. Therefore, if the system cannot be challenged under Title VII, it follows that it also is immune from attack under § 1981.

For the reasons set forth above, this Court will dismiss all of the class claims regarding discrimination in transfer except that concerning the manning of new facilities. That claim will be retained under Title VII and §§ 1981 and 1985(3) against both USS and the union.

*Harassment and Discipline*

█ Plaintiffs claim that management harasses, disciplines and discharges black employees more than white employees. They have, however, provided no statistical proof of such charges. The Court has not been told, as it was in *Croker* for example, that blacks receive proportionately more discipline slips than whites. It has not been presented with even raw data as to the number or distribution of discharges each year. In short, no class-wide proof of disparity has been presented. These charges rest solely on the testimony of a few individual class members at trial.

Many of the witnesses at trial had relatively clean discipline records. Other witnesses had extensive lists of discipline slips in their files and a few were discharged.

Like the transfer system, the discipline procedures vest large amounts of discretion in the foremen. Each employee is given a copy of the plant rules when he is hired. Discipline slips, detailing the alleged infraction, its circumstances, and the punishment meted out, are to be given or mailed to the employee following any incident. The system requires cumulative punishment: first, an oral warning, then a written one, on up through successively longer periods of days off until finally, discharge. If an individual is unhappy with the discipline received, he can grieve the matter through the union's procedure. If successful, he may have the discipline slip removed from his file and receive any lost wages he suffered.

Testimony has been received on numerous instances where individuals believed they had received discriminatory discipline. Some of these instances establish discrete prima facie cases; others, as outlined more fully below, do not. Viewing the combined incidents as a whole, plaintiffs prove neither a case of disparate impact or treatment. The "facially neutral practice," of giving to foremen virtually unfettered discretion, has not been shown to affect blacks more than whites. The specific instances of discrimination do not amount to more than isolated incidents of discriminatory treatment and do not meet the *Teamsters* decision's standard of pattern and practice. Since this claim fails on both grounds, it will be dismissed.

Plaintiffs also claim that the class members are "routinely harassed" by supervisors. However, very little credible testimony has been introduced on this subject. The Court cannot find, on this record, that racial harassment was the "standard operating procedure" at Fairless Works.

Finally, plaintiffs claim that USS refuses to negotiate or recognize claims of racially-based discipline brought to its attention by members of the civil rights committee. No class proof was presented of this claim. Since plaintiffs have failed to establish a prima facie case of disparity, the Court will dismiss the claims of harassment and dis-

crimination in discipline as to the class. Individual cases will be considered below.

## Grievance Processing

■ Plaintiffs have claimed that in disciplinary matters, the union failed to correct the company's allegedly disparate handling. Since the claim against USS has been dismissed as to discipline, any vicarious liability which the union might have fails also. However, plaintiffs contend that the union is liable on its own for failure to process grievances as an independent Title VII violation. This Court finds that this claim is not established.

Many witnesses testified as to the handling of their grievances. Of these, a number blamed the union for the unsatisfactory results. However, very few of these witnesses revealed any evidence of disparity, either in the system or their treatment under it. *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), established the standard for deciding if a union wrongfully breached its duty to process grievances. Not all grievances are entitled to be processed. Only if the union representative can be shown to have acted out of bad faith, evidenced by disparate treatment because of racial discrimination, may the Court intervene. The testimony of the individuals, of which little meets the prima facie level, does not reach the level needed to establish a "pattern and practice." No other class-wide evidence was elicited, for example, as to the number of grievances processed. Therefore, this claim must be dismissed as to the class.

## Hiring

Previously, this Court decertified from the class the individuals who had unsuccessfully applied for hire at Fairless Works. See Memorandum and Order, *Dickerson v. United States Steel*, C.A. No. 73–1292 (E.D.Pa. August 21, 1976). This action effectively removed the issue of discrimination in hiring from this case. In light of that order, and plaintiff's resultant lack of evidence on the subject, this claim will be dismissed.

## Implementation of Consent Decree

■ The steel industry became subject to a consent decree in 1974, *United States v. Allegheny-Ludlum Industries*, 64 F.R.D. (N.D.Ala.1974). Plaintiffs contended at trial that this Court was an appropriate forum for reviewing any failures to administer that decree. This Court, in certifying the instant case, recognized that the decree did not foreclose a suit against USS. *Dickerson v. United States Steel*, 64 F.R.D. 351 (E.D.Pa.1974). However, it is clear that violations of the consent decree can be properly tried only in Alabama. Therefore, the Court excluded this evidence at trial. See *United States v. A.T. & T.*, C.A. 73–149 (E.D.Pa. August 20, 1976) (Higginbotham, J.) This claim will not be dismissed.

## Racially discriminatory atmosphere

■ Plaintiffs' Red Book claims include one entitled "racially discriminatory atmosphere." This appears to be an agglomeration of the other claims of specific discriminatory practices into one mass which will allow every black at the plant to recover. The Court thinks that such a claim, especially in a case of this magnitude and with these facts, must be denied.

As a class claim, this is virtually incapable of proof in all but the most blatant of situations. Such a nebulous concept—that of "atmosphere"—is not susceptible to any accepted methods of proof in a court of law. To allow plaintiffs to establish it as it has been alleged in their pretrial statement, as a totality of all allegedly illegal practices, would be to impose double liability on defendants. First, they would be liable for any illegal practice, such as initial assignment discrimination, to those individuals directly harmed. Second, they would be liable to those same individuals and any others aware of such practices for a chilling effect. Although some courts have recognized this chilling effect for purposes of remedy, see *Franks v. Bowman*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), establishing it as an independent basis of liability stretches Title VII beyond its intended purpose.

Even if such a cause of action existed, plaintiffs have by no means proved it on the facts to the degree required by *Teamsters*. Although some witnesses indicated that they failed to apply for certain jobs or to pursue remedies because they anticipated being rejected, this was by no means shown to be pervasive. All that was shown was that some persons were more negative, assuming the worse, than others who doggedly and often successfully pursued their rights.

Plaintiffs attempted to get in proof of defendants' discriminatory "reputation" under Fed. R. Evidence 405 and 803(19). Such evidence may be of help in the damages stage of this trial, but this Court has not been able to find a single case that holds a "discriminatory reputation" to be a Title VII violation. This is most likely because reputation cannot necessarily be controlled by the individual and certainly cannot be termed a "practice."

Finally, it should be noted that plaintiffs have included, under this claim as to individual witnesses, incidents of racial name-calling by fellow employees. As held in *Croker, supra*, acts of fellow employees are not usually bases of claims against the employer. "Liability can only be premised on the employer's failure to take reasonable steps to prevent racial harassment of which its upper level management is aware." *Croker*, at 1192. These few incidents, which do not demonstrate any awareness by the hierarchy, also cannot support this claim as to the class any more than they do as to the individuals.

## CLASS CLAIMS NOT DISMISSED

Although not required under Rule 41(b), the Court feels that it is appropriate to explain at this juncture why certain class claims were not dismissed. This discussion is designed to alert the parties to the issues important in the Court's opinion, so that the remainder of the trial may proceed more smoothly. The parties, of course, must keep in mind that this analysis of the plaintiff's case is not set in concrete, and certainly may change after presentation of all the evidence. At this stage, however, the Court has decided that plaintiffs have shown, by a preponderance of the evidence, a case of racial discrimination against both USS and the union on certain issues. As this Court held in *Croker*, the plaintiffs retain this burden throughout the trial; it never passes to the defendants. A brief discussion of what the Court perceives as the material facts and law on these issues is set forth below.

### Initial assignment

The bulk of the plaintiffs' class-wide evidence pertains to the issue of initial assignment to production-and-maintenance jobs. This claim is one of both disparate impact and treatment. They first argue that the USS practice of assigning new hires at the Fairless plant, including the Pipe and Rod and Wire mills, invites discrimination in its very structure. Second, they claim that by looking at the results of this system, a discriminatory pattern of assignments can be discerned. Finally, they contend that this discrimination can be shown to be intentional. Thus, in this way plaintiffs have presented a class-wide prima facie case, which this Court finds has thus far been established by a preponderance of the evidence under both Title VII and § 1981.

Plaintiffs have first shown that the system for assigning new hires at the Fairless personnel office, including the mill offices prior to their assimilation, is one in which a large degree of unchecked discretion is given to certain management offices. When a person comes into the office, he fills out an application for hire on which he will list past experience and training. He may indicate a preference for a certain type of work, which is often influenced or dictated by what jobs he is told are available. For example, Carl Smith, who wanted a clerical job, indicated on his application that he desired "any job" when told to do that by the interviewer (P–3003, N.T. 4260). Often, he is told that he will be called later, and the application is put on file and he is sent home. The evidence shows that USS hires

in volume, calling in large numbers of persons as requisitions come in from the departments. When hiring is needed, an interviewer goes to the file drawer and pulls out applications. The files are organized by skill—labor, trade and craft, clerical, college graduate. The interviewer decides the appropriate classification for each application. There are no guidelines promulgated as the requisite levels of skill for each category.

There are no set procedures by which interviewers select applications for assignment to particular jobs.[17] An interviewer may select applications for each job in any way he desires, using any criteria. There is no record evidence that the entry-level job requirements vary for one non-craft job to another. Thus, no previous work experience or skills need determine whether a person becomes a laborer in Sheet and Tin or in Masonry. All must pass only a basic physical examination in order to qualify for the laborer's job.

However, the evidence reveals that some interviewers have their own criteria for assigning laborers to different departments. One interviewer, now deceased, was quoted by two witnesses as saying that he sent so many blacks to the open hearth because "blacks can stand more heat." N.T. 5417, 5468. Another interviewer did not send blacks to Sheet and Tin and other departments because the foreman had complained. These conscious decisions to channel blacks into certain jobs and away from others are easily implemented under the system at USS. Each application has a race code on its face, placed there by the receptionist.[18] Thus, by simply pulling applications and looking at them, an interviewer can determine the race of the applicant. In that way, an interviewer could select a predomi-

nately white or black hire pool, depending on the job available.

As was testified at trial, once the applications are pulled, the people are called in and must pass a physical. They may then be sent to be interviewed by foremen. At this stage, another element of discretion and potential for discrimination is introduced. The foremen are allowed to reject applicants on their own. This may be done on the basis of race by some foreman, according to the evidence.

This system, operating theoretically, is not a violation of law. It is facially neutral and if implemented by race-blind personnel, it could function without discrimination. However, it is evident that certain powerful individuals—in the personnel office and in the plant—have exercised their discretion on a racial basis. A "racially-based" decision, it should be noted, need not be one based on malice or bad feelings toward a race. The decision of an interviewer not to send blacks to a certain department in order to avoid complaints or harassment is as much a "racially-based" decision as is a foreman's decision to reject blacks because he does not want to work with them. Any employment decision which arbitrarily closes the doors to certain jobs for members of one race as opposed to another is a discriminatory act, regardless of whether it is motivated by ill will or not. *Griggs v. Duke Power Co.*; *Croker*, at 1182.

However, the plaintiffs did not rest their case at this point. They presented data developed by Drs. Peter E. Haimes and Samuel Litwin which showed that blacks in fact had been channeled into certain areas of the plant. These "lousy jobs"—more formally called undesirable clusters—con-

17. The Court bases this conclusion on the evidence presented by personnel office staff members. Sheila Walker testified that there was "no set up way" to pull applications. N.T. 5454. The stipulation on James B. Henderson's testimony stated that "Personnel Clerks were instructed to pull applications from the appropriate category (corresponding to skill requisitioned) by taking earliest (oldest) applications first [whenever possible]." Stipulation, paragraph 2(g).

18. The Court recognizes that the coding of applications is part of USS' attempts to comply with Equal Employment Opportunity Commission requirements. However, there are other ways of recording the numbers of black and white applications, as Dr. Haimes testified, which would not tempt interviewers into acting in a discriminatory manner.

sisted of either "hot" jobs and/or low-paying jobs.[19]

This study, contained in Appendix G of the Matched Pair Study (MPS), shows a consistent historical pattern of concentration of blacks in these five types of jobs. In each of the time periods, approximately 60% of all blacks hired were assigned to these areas, while only 40% of the whites were.[20] Although not as gross a disparity is demonstrated here as in *Teamsters*, this is the type of evidence that the Supreme Court has held is probative of discrimination. See also *Dothard, supra.*

Even though these disparities are not as gross as in the *Teamsters* or *Dothard* cases, the Court feels that they lend support to an inference of discrimination. First, they do not stand alone. They are bolstered, as in *Hazelwood*, by a convincing array of non-statistical proof. The record contains testimony as to a history of discriminatory assignments at Fairless back to its opening in the early 1950's. Many witnesses were visually impressed with the discriminatory pattern as they walked through the plant. Robert Garrison, who was hired as a janitor in 1960, saw many parts of the plant as part of his job, and he wanted to transfer. He testified:

> "Like I say, I went around to different departments and I said to myself, where do blacks work at? I never seen them on decent jobs. I said to myself, no sense in me waiting on that job because I know I wouldn't get it. I could see it as plain as day." N.T. 4193.

John Byzek, a white retired foreman who had worked at Fairless since its opening, related a conversation in which he was told to hire blacks. Some blacks were hired in this period, as the evidence shows, but life was not always smooth. William Roberts, who was hired into General Services in 1953, was transferred out to Sheet and Tin by a sympathetic foreman. He and the two blacks sent with him were the first to be assigned to that department. His foreman cautioned him, though: " 'If it gets too rough over there . . . see your supervisor.' " N.T. 3757. Others, such as Harold Kelley, testified to the absence of blacks in units such as the Skelp mill as late as 1966. This history, as well as the first time period of the MPS chart, does not form a basis of liability as to those events of discrimination revealed. However, the Supreme Court has clearly mandated that such a history should be considered in deciding whether a present pattern and practice of discrimination exists. See *Griggs, supra; Evans, supra; Hazelwood, supra.*

As reviewed above, the plaintiffs have shown a "standardless and largely subjective" assignment procedure, as in *Hazelwood*, —— U.S. at —— , 97 S.Ct. 2736. Finally, as in *Hazelwood* and *Teamsters*, they have presented live testimony by individual persons who have suffered discrimination. In view of all these supporting elements of proof, this Court believes that a statistical disparity need not reach the gross levels of *Teamsters* in order to be considered.

---

**19.** The Court is aware that these jobs are not the only jobs which are "hot" or low-paying, nor do they rank the highest in the plaintiffs' empirical "undesirability" studies. The clusters were picked because they had the most hiring activity during the period—at least 25 persons were hired—and were at least 33% black. In this way, plaintiffs found the clusters which were active in the hiring process and where it appeared that racially-based hiring had occurred. The "undesirability" rating served to confirm their description of the blast furnace, open hearth and masonry units as "hot" areas. The "undesirability" rating—the "lousy job" study—shows the average of factors of physical effort, environment and hazard. N.T. 1190. Furthermore, jobs in each of these clusters, except the open hearth, earn below average, with janitor being the lowest-earning job in the plant. See Tables G–7, G–8, G–9.

**20.** To be precise, in first time period, January 1, 1952 to December 31, 1967, 56.3% of blacks were hired into the five clusters while only 38.0% of the whites were. From January 1, 1968 to April 11, 1974 (the date of the consent decree) 63.9% of black hires went to the "lousy jobs" while only 37.9% of the whites did. In the last time period, 59.4% of the blacks and 45.5% of the whites were assigned to these jobs.

The analysis in Appendix G was supplemented by a large number of corroborative tables. Appendix K [21] shows an impressive disparity in the percentage of MPS whites and blacks assigned to "substantially white" [22] clusters. In time period 1, relevant for background only, 17.6% of all whites assigned were sent to these clusters, while only 4.3% of the blacks went there. In the second time period, the distribution was 8.2% of the whites as compared with 3.1% of the blacks. In the last time period, 12.8% of whites went to these heavily-white jobs, while only 4.7% of the blacks were sent.

Defendants have attacked the validity of the MPS in a number of ways. First, they have moved to strike the sample and the evidence it supports as not having the foundation required for use by the Court. Both Dr. Litwin and Dr. Haimes testified as to the methods used in picking employees for the study. Dr. Litwin explained that a substantial fraction of both black and white active employees was used in the study and the sample was thus a numerically sufficient sample. Whites were "matched" with blacks to control for disparities of service dates. The sample seems to have been scientifically drawn from the active population and is viewed by the Court as a proper one. While defendant USS tried to establish an element of "backward bias" in the study, this was repudiated by both experts. The rematching computer run, known as Court Exhibit 7, demonstrates the accuracy of the pairing of the blacks with whites. The Court finds this to be a convincing negation of any "backward bias." Therefore, the motion to strike the sample is denied. [23]

To further bolster their evidence, plaintiffs examined defendant USS' Affirmative Action Program (AAP) materials, which show "snapshots" of the workforce, giving the number of employees in each department as of a particular date. Defendants have challenged these studies, which extend to the Rod and Wire and Pipe mills, as irrelevant, and have moved to strike the latter studies. However, plaintiffs have shown this Court that the location of employees at Fairless Works is a fair approximation of where they were initially assigned, since the transfer rate is so low. In Appendix, J, Dr. Litwin estimated that at most 2½% of the employees transfer each year. In light of this fact coupled with the high turnover at the plant, the Court will accept these studies as further evidence of initial assignment discrimination at Fairless, and will deny defendants' motion to strike.

**21.** Defendants have moved to strike Appendix K and testimony pertinent to it on the grounds that Dr. Litwin did not testify as to the statistical significance of the disparities, as in *Commonwealth of Pennsylvania v. O'Neill*, 473 F.2d 1029 (3d Cir. 1973). In light of the Supreme Court's acceptance of statistics without significance analyses in *Dothard* and *Teamsters*, the Court believes that the Third Circuit's rule has been overruled or at least, does not apply to Title VII cases. This Court's order of June 21, 1977 did not require statistical significance studies, but only that Dr. Litwin testify as to the validity of the methods used. By validating the MPS sample and methodology, Dr. Litwin has validated Appendix K.

**22.** These clusters were defined as those clusters which contained more than one employee and which were less than 10% black. The Court notes than in time period two, all of these clusters earned above the average but one; in time period three, half of them earned above average, with the other half earning within $500 of the average. See Tables G–8 and G–9. Furthermore, in time period two, five of the eight clusters had an undesirability quotient of 1.25 or less (maximum 3.19, minimum 0), and in the third time period, six clusters rated only 1.25 or below, with two clusters rating higher. Therefore, in addition to plaintiffs' definition of these clusters as "substantially white," they also appear to be relatively "desirable," being generally higher-paid and less physically uncomfortable than other jobs in the plant.

**23.** Of course, any conclusions that the Court has made as to the validity and accuracy of the MPS or any other statistical devices and analyses have been made on the basis of the preponderance of the evidence and are under no circumstances irrebuttable. All that the Court means is that it has decided at this juncture that the challenges raised on cross-examination and in argument do not sufficiently undermine a finding of propriety in relying on these studies. Further evidence may prove that reliance to be ill-founded.

The main plant's AAP data are summarized in Table G–11. Table G–11 repeats very closely the 60–40 disparities shown in Appendix G.[24] What this shows the Court is that when viewing the main plant as a whole, rather than only a sample of it, independent of any possible biases introduced by the MPS, there is still a significant 60–40 disparity in where the employees actually are. This disparity is virtually the same in both time periods, and is very close to that shown in the MPS. This chart corroborates the MPS and further convinces the Court that the MPS is an accurate and valid analysis.

The Rod and Wire mill and the Pipe mill employees were not included in the MPS because many of them were hired by a separate personnel office. However, as Dr. Haimes testified, the blacks are overrepresented in the lower-paying jobs in both divisions. In the Pipe Mill, in 1975, 54.7% of the blacks are employed in sequences averaging J.C.5 or less, while only 39.3% of the whites work in these areas. In the Rod Mill, 55.6% of the blacks held J.C.6 or less, while only 36.2% of the whites were so employed.

■ To complete plaintiffs' analysis of USS' initial assignment policies, Dr. Litwin prepared Appendix M, which is an analysis of the inactive employees' assignment. This study completed the universe of initial assignments, since it covers the employees who were not analyzed in either Appendix G or Table 6–11. The results of this study are further corroborative of the MPS. The 60–40 split is again repeated—59.7% of the

inactive blacks had been assigned to the five clusters as compared to 43.0% of the whites. Defendants have moved to strike this table, claiming that the sampling method was invalid. However, the alleged flaws in the sampling study do not appear to the Court to be that important. No blacks were chosen from the 1974 file, and more whites were chosen from the early years, due to "wraparound," or overlapping of the sample drawn. Both of these facts are tied to termination dates, which is the order in which inactives are filed. This is external to the data base and should not affect the validity of the sample. Furthermore, defendants claimed that the study should not be included, since some persons in it were assigned outside the statute of limitations and thus have no claim for liability. This is of no importance either, since the study's purpose is merely corroborative, showing the accuracy of the MPS, and is not an evidentiary basis for liability. Therefore, it constitutes a relevant background item for the Court's consideration.[25] *Evans, supra.* The defendants' motion to strike will be denied. Furthermore, the motion to strike the testimony of Drs. Litwin and Haimes will also be denied.

■ In further support of many of their analyses, the plaintiffs offered evidence of statistical significance. This type of evidence has been recognized by the Supreme Court in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (March 22, 1977) and *Hazelwood*, —— U.S. at ——, n. 14, 97 S.Ct. 2736, but is not a prerequisite to the acceptance and use of data by a court.[26]

24. In 1973, 56.30% of the blacks worked in the five "undesirable" clusters, while only 32.93% of the whites did. In 1975, 57.43% of the blacks could be found in these work areas, while only 39.83% of the whites worked there. Table G–11.

25. The Court did strike the regression analyses because they contained evidence outside the limitations period. In that situation, however the statistical technique was much more sophisticated and sensitive. The Court felt that inclusion of the earlier data would so severely influence the regression curves' shapes as to render the analyses irrelevant. This inactive

study, the Court believes, does not have the same problems of delicacy.

26. In both *Hazelwood* and *Dothard*, the Justices relied on statistics which were not shown to be significant by any analyses in the evidence. In *Hazelwood*, at n. 14 the Court referred to its discussion in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272 (1977), and did some calculations of its own, based on standard deviations, but appeared to rely as a whole on the "eyeball" approach to the percentages themselves. In *Croker*, the plaintiffs did not present any statistical significance studies at all, but the Court still accepted the evidence as probative of a prima facie case.

The defendants have moved to strike the significance studies as irrelevant, since they contend that assignments at Fairless Works are not done randomly. That motion must be denied. The plaintiffs have demonstrated with these studies, that from a statistician's point of view, race is associated with initial assignment at Fairless. This evidence is clearly relevant. What this means is simply that the distributions did not occur by accident. The disparities of the MPS must now be rebutted by the defendants, either by discrediting the study's results with their own experts' presentations or by the affirmative defense of business necessity.[27]

The Court will not dwell on a discussion of these significance studies, because in general, they speak for themselves. However, defendants have argued that the analyses reveal a fatal flaw of "post-hoc" reasoning because Table G–1 analyzes clusters selected on facts internal to the data. Although Dr. Litwin acknowledged that this was apparently a violation of a statistical precept, he explained to the Court's satisfaction why that selection did not affect the study's validity. The five clusters, as noted before, were chosen because they were active and were the most disparate.[28] However, when the statistical analyses were run on each cluster, a larger number of these clusters were found to be disparate than statistically expected and these disparate clusters repeated themselves over the time periods. Therefore, Dr. Litwin concluded, any possible bias from the cluster selection had not in fact been introduced, or such a result would not have been found. As plaintiffs demonstrated, at most, one cluster would have been significantly disparate. Instead, there were found in two of the three periods.

Therefore, the Court has decided that plaintiffs have proven a case of racial discrimination. This case is sufficient under both Title VII and § 1981. Intent can be inferred not only from the repetition of the 60–40 split over time and between locations, but also from the testimony regarding the interviewers' statements. Even if the statistics alone were not sufficient, these statements of intentional discrimination constitute the "smoking guns" of plaintiffs' proof.

■ In addition, since this discrimination has been shown to be easily discerned and in fact commonly known, the Court has decided that the union's liability is also implied. *United States v. Bethlehem Steel*, 312 F.Supp. 977 (W.D.N.Y.1970), *rev'd in part on other grounds*, 446 F.2d 652 (2d Cir. 1971). The Court has inferred, from the union's record admissions of these policies throughout the steel industry, the obvious nature of the policies at Fairless and their continued effect without any lessening in intensity, that the union was aware of these policies and failed to act on behalf of the minority employees. Furthermore the Court has decided not to dismiss the § 1985(3) claim.

*Access to Management*

Plaintiffs have presented essentially the same type of proof in their case regarding black employees' access to management positions as they did for their initial assignment claim. First, they have shown a history of discrimination in management promotion at the plant. John Byzek testified that in 1953, he recommended that a black be made foreman. He was told by his general foreman that "he don't put black people on management." N.T. 3260. Wil-

---

**27.** Defendant USS has erroneously argued that plaintiffs must show that the disparate pattern does not result from such factors as variance in skills, plants needs, employee choice and others. These arguments constitute affirmative defenses which are the defendants' burden to raise before the plaintiffs would be required to refute them. See *Croker, supra; Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

**28.** Defendant USS' Hypothetical A does not rebut Dr. Litwin's testimony for two reasons: 1) it does not purport to follow the same rules used in selecting the five undesirable clusters, because it does not require that the selected clusters be the most disparate, and 2) it does not follow Dr. Litwin's analysis, in that each cluster is not analyzed separately for its statistical significance. These flaws defeat Hypothetical A.

liam Roberts, who had been a gang leader at another USS plant, was hired as a laborer at Fairless in 1953. Jeremiah Kauffman testified that when he was hired into the open hearth in 1953, there were no black managers there. Finally, Charles Moseby at his deposition told of overhearing a white foreman tell black workers in the Pipe mill that he "didn't think the white employees were ready for a black foreman. He thought they wouldn't work for them." Deposition of Charles S. Moseby, at 35.

Second, they have demonstrated a "standardless and largely subjective" system of hiring managers out of the P & M workforce. USS hires three-quarters of its first-level managers from its own labor pool. The foremen are chosen by foremen—one witness, a retired manager, characterized it as "sort of a buddy-buddy situation." N.T. 3258. George Wilhere, superintendent of personnel services at Fairless, testified that "you get to be a foreman by doing a good job." Deposition of George Wilhere, at 53. Employees are approached by their immediate supervisor and asked if they would be interested in becoming a manager. Blacks with experience as supervisors are often not approached. Jeremiah Kauffman, for example, had discussed with foreman the possibility of becoming a foreman, in light of his past experience as a manager, but he was never offered the opportunity. Defendant USS repeatedly asked witnesses if they had taken advantage of a "self-nomination" program to management, but none of the blacks showed any awareness that such an alternative route existed. Wilhere testified that the program had been put into effect in mid-1975, but that no foreman had been hired out of such a program, since there were few openings. The Court concludes that the general system of promoting to management is one that has a significant potential for discrimination, especially by perpetuation of the racial patterns through its self-selection procedure.

Third, the plaintiff presented data showing the small number of black managers at Fairless. Exhibit P–42 showed that in 1974, 1.7% of the first-level managers were black. In the plant as a whole, 12.01% of the workforce was black. In 1973, blacks represented 1.3% of first-level management, compared with 10.5% of the workforce.

Dr. Litwin testified that the expected number of black managers in 1973 would have been 31. In fact, there were only 6. The probability of the 1973 distribution is very low and is even lower for the 1974 distribution. This is the type of evidence that constituted a prima facie case in *Croker*. The burden is now upon USS to show an affirmative defense, or to attack the validity of the analysis, which were both done by Boeing in *Croker*. These statistics present a very strong inference of discrimination at present.

Defendant USS has already attempted to attack Dr. Litwin's analysis by cross-examination. However, it appears to the Court that the analysis he presented was slanted in the defendant's favor, giving it full benefit of the doubt. Therefore, that analysis will be accepted. Second, USS argues that the Court cannot presume that blacks will be as equally represented in management as they are in P & M. That presumption, of equal opportunity, is the essence of the laws on racial discrimination. It is the plaintiffs' burden to show that blacks are not getting certain opportunities, while it is defendant's burden to demonstrate a good reason why this is. In *Croker*, the defendant successfully rebutted the statistics by showing that fewer blacks had the experience equal to whites, and thus those inexperienced blacks were not being moved up. In this case, the main qualification for becoming a foreman is "doing a good job." Defendants, not plaintiffs, have the burden of convincing the Court that proportionately fewer blacks than whites are doing a good job at Fairless.

Finally, USS has raised a legal challenge to the data presented. Defendant argues that *Hazelwood* forbids the use of internal data comparisons, such as this manager-to-plant workforce comparison. This is not true. The *Hazelwood* Court criticizes a comparison made by the district court of the number of black teachers to black stu-

dents. Instead that decision endorsed a comparison of black teachers in the system to black teachers in the geographical area. The latter is similar to the comparison made here. In *Hazelwood*, the High Court was concerned about the availability of black teachers; they did not want to impose an unrealistic burden on the school of finding more black teachers than there were available. So, they said that the "expected" number of teachers should proportionately correspond to the pool from which they were drawn. Here, plaintiffs have made the same comparison. Most of the first-level managers are drawn from P & M. Therefore, they have compared the percentages of black managers with that of black P & M workers. This is completely in accord with *Hazelwood*. Finally, if the Court were to follow defendant's suggestion of comparing the number of Fairless black managers with external data, such as the number of managerial blacks in the locale, it would not be appropriate to the facts. George Wil here testified that foremen are rarely hired off the street. Therefore, that comparison would be invalid, since it does not reflect the available labor pool for managers.

Finally, plaintiffs have bolstered this evidence with the testimony of those, such as Jeremiah Kauffman, who have not been able to become foremen. In light of all this evidence, including the gross statistical disparities, the Court has decided to deny the Rule 41(b) motion on this issue as to both § 1981 and Title VII.

*Access to Crafts*

In order to receive a job in the crafts at Fairless, one must pass a test. Journeymen are given performance tests, and apprentice program applicants are given a battery of standardized paper-and-pencil tests. The plaintiffs have presented a case of disparate impact on the class as a whole, through statistics about apprentice test results and the number of blacks in the crafts. This has been buttressed by individual testimony by persons who were discriminatorily treated, in that they were denied even the opportunity to take the tests.

*Griggs* and its progeny establish a strong rule against unnecessary tests and job requirements. "If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, that practice is prohibited." 401 U.S. at 431, 91 S.Ct. at 853. Therefore, the plaintiffs' burden is merely to show that the tests have a disparate result. *Johnson v. Goodyear Tire and Rubber Co., supra*. The plaintiffs have done so in this case.

First, the plaintiffs have shown, as in *Griggs*, that the black pass rate on the apprentice tests [29] has been significantly and consistently lower than the white rate. This pattern has continued, despite changes in the tests used and the computation method of the pass rate. Prior to 1973, the overall ratio of whites to blacks passing was four to one. After changes were made in 1973, the ratio changed to 3.6 to one. This disparity raises a strong inference that the tests are discriminatory. Therefore under *Griggs* USS now must demonstrate the job-related nature of these tests.[30]

Furthermore, the statistics bear this disparity out by showing a disparate population in the apprenticeships. In 1968, only 2.1% of the apprentices in the main plant were black and in 1969, 1.7% were black. This is compared with a general plant-wide percentage of 8.28% for both years. Dr. Haimes testified that this is a serious underrepresentation.

This disparate pattern was also shown in the craft positions in all divisions. The MPS showed that in the first time period, 5.0% of the whites were initially assigned to the crafts, while only 2.0% of the blacks were. In the second period, the first time

---

**29.** Counsel have stipulated that the procedures were the same for all divisions of Fairless, including the Rod and Wire and Pipe mills.

**30.** Since the apprentice battery is also a requirement for entry into metallurgy and inspec tion jobs, the pass rates disparities form a prima facie case on that issue as well. In 1973, three out of 97 persons in metallurgy and inspection were black. In 1975, there were 11 out of 147.

within the statute of limitations, it became more disparate, with 9.8% of the whites getting initial craft assignments as compared to 1.5% of the blacks. Since the Consent Decree in 1974, 29.9% of the whites got into the crafts upon initial assignment as compared to 15.6% of the blacks. The AAP data shows similar disparities for all parts of the plant in 1973 and 1975.[31] Dr. Haimes testified that black employees were underrepresented in the crafts by one-third.

■ The Court feels at this time that the disparity in pass rates for the apprentice battery coupled with the fact of under-representation in the program makes a strong prima facie case under *Griggs* as to discrimination in the apprentice program. In addition, the underrepresentation in the crafts is also a significant fact in the proof of discriminatory access to crafts. This becomes more important when considered with the other evidence plaintiffs have presented on access to journeyman positions. Again, the system is highly discretionary, as to initial assignment. The interviewers decide which applications go into the "trade and crafts" bin at the office. There are no promulgated standards as to length or quality of experience, although some have been made up informally. There has been testimony by witnesses that they had to request a number of times before they were allowed to take the journeyman's test. John Davis, Willie Noble and Eddie Williams all were rebuffed in their early efforts to take this test. Hubert Leonard was told that his prior welding experience was of no consequence because he needed seniority to bid on a welding job. Artis Graham was assigned to the open hearth as a laborer despite his one year of welding school. He was allowed to take the apprentice test but failed it.

■ Taken together, this evidence shows a prima-facie pattern and practice of discrimination in access to the prestigious crafts jobs under both Title VII and § 1981 against USS. In addition, the Court has decided not to dismiss the claims against the union. It is clear that the union is aware of these practices, but little changes have been seen. Their apparent inaction is especially grievous in light of their rights under the contract to a nondiscriminatory testing. These contract rights have been gutted by the union's failure to enforce them through the grievance system or by negotiation. Of course, any claim of union inaction can be rebutted by evidence that negotiations or other genuine attempts to change company policy have been undertaken and have failed. At this point however, the inferences raised by this record require that the union must be held to account for this continuing and recognized discriminatory actions.

## INDIVIDUAL CLAIMS DISMISSED

The Court has made findings of facts and conclusions of law regarding the named plaintiffs' and the individual witnesses' cases which are now being dismissed. These will be incorporated into the discussion below. The "claims" are those testified to either at deposition or at trial, or raised in the Red Book.

Where all of an individual's claims are not dismissed that individual is not mentioned in this section. Where only some claims of a person are retained, the ones dismissed are discussed. The Court has not discussed all the claims retained.

John Davis' claims will be retained except for his claim against the union. He complained to the union regarding the failure to give him a welder's job, and he was then tested. The union said that he should not be required to go through the apprentice program. He was then hired as a starting welder, but was unable to talk to the union representative because the grievance man

---

**31.** In 1973, 2.7% of the crafts employees were black, as opposed to 12.2% of the workforce. In 1975, 3.6% of the crafts employee were black, as compared to 12.4% of the entire plant. In the Pipe Mill, in 1973 1.6% of the crafts were black while the mill was 13.8% black as a whole. By 1975, that number had risen to 8.5%, but the plant was then 14.5% black. The Rod and Wire tables show a statistically significant underrepresentation in the crafts, according to Dr. Litwin.

was busy. He then complained to another union man about his equipment. Right after that, there was a change in the office and a new grievance man took over, who handled this grievance to Davis' satisfaction. Later, he complained that he had no opportunity to file a grievance on his light duty claim because the union man was on a different turn. This may be evidence of inadequate service by the union in some instances, but taken together these complaints do not rise to the level of race discrimination or bad faith.

James Rembert made two claims—of disparate discipline and union discrimination. Only the later claim will be dismissed. He was suspended by his foreman on July 15, 1976, subject to discharge. He went to his grievance man, Reggie Griener, who was cooperative in filing his grievance. At the second step, the foreman denied Rembert's version of the facts, so the grievance proceeded to the third step. The issue of race discrimination was not raised until the third step, when the grievance was handled by the department's grievance chairman. However, the witness was vague about whether he had discussed the possibility of race discrimination with Griener in the early stages. The grievance has since proceeded to the fourth step. The Court concludes that there has been no prima facie case made on this claim, since the union representatives acted in good faith.

Alphonso Overstreet testified to two claims, one of which will be dismissed. He related an incident in 1975 regarding a racial slur directed at him by a fellow P & M employee. He complained to the assistant general manager, Frank Lemkin, who told him not to be "too tender." There was no evidence of repetition of the incident. The Court finds that a single insult by an employee, as reprehensible as it may be, cannot form a basis of liability against management. If an employee was allowed to continually harass fellow workers without being disciplined, that might be held against the employer. See *Crocker, supra* 1191–1192; *Anderson v. Methodist-Evangelical Hospital*, 464 F.2d 723 (6th Cir. 1972).

Benjamin Evans' claims will be dismissed, since they stem from events occurring prior to the statute of limitations. His seniority claim arose in 1955, along with the claim of discriminatory treatment by the union. His claim of discrimination in denial of light duty arose in 1965. For these reasons, he was not allowed to testify at trial.

Manfred James' testimony was largely struck at trial as unbelievable. Therefore, all his claims except the carpentry shop claim will be dismissed.

Jack Miller's testimony was struck at trial because no foundation was laid to show his association with USS. He was hired at National Tube, which later became part of Fairless. However, no evidentiary basis was shown for USS' liability as a successor.

Edison Williams testified on two issues. First, he contends that his assignment to a laborer's job was discriminatory. This must be dismissed as time-barred, since he was hired in 1966. The second, which apparently occurred in 1967, has to do with his transfer to the Welded Fabric unit. He asked to be transferred from his J.C.9 position in the Pipe Mill to a J.C.12 in the new Wire Mill unit. Instead, he received a J.C.2 job and was not allowed to transfer back. This is evidence that pertains to the class-wide discrimination in transfer to new facilities. Therefore, this claim will not be dismissed.

Warren Hallback made a number of claims, some of which fail to satisfy his prima facie burden. His 1966 claim of discriminatory assignment will be dismissed as time-barred. At trial he told of his experience in training for and becoming a craneman, which is a sought-after job at Fairless Works. The Court will retain his claim of discrimination in training. He claims that once he got the job as craneman, workers on the floor refused to work with him. However, that appears to be based on the fact that he was "green," or inexperienced, rather than because he was black. Although the Court has decided not to dismiss the issue of Hallback's removal as a craneman, in light of the evidence on the other

accident, the claim against the union will be dismissed. The union pursued his grievance through the fourth step and then dropped it. Their decision not to take it to arbitration is within the discretion given to them under *Vaca* where, as here, there is no indication of racial discrimination. Finally, the Red Book incident on discharge, in 1966, is dismissed as beyond the statute of limitations.

Alan Edwards had a number of complaints pertaining to his work as a craneman in the 80-inch Hot Stup mill. The Court will not dismiss the issue of discriminatory discipline arising from the accidents, since the record contains evidence from which Court may infer a disparity. The union discrimination claim will be dismissed because all that is shown is that the union exercised its *Vaca* discretion and withdrew a losing grievance after the third step. Finally, the Court has considered the claim of "racially discriminatory atmosphere" and has decided to dismiss it as merely cumulative of this witness' other claims.

Lieutenant W. White was deposed on three claims, which will be dismissed. In October, 1975, he was waiting for the required safety man, when a foreman told him to start working. When he protested that such work would violate the safety rules, he was given three days off for insubordination. Plaintiffs have not shown that such treatment was disparate, although perhaps unfair. This does not prove discrimination. The Red Book outlines a claim against the union on White's grieving of this incident, but no testimony was presented. That claim will be dismissed. The harassment claim, where White contends that his supervisor was giving him the hardest job and was observing him too closely, will similarly be dismissed as lacking proof of discrimination. Although he was asked to do work which was not part of his job, he testified that whites were also made to do this.

Ananias Mitchell contends that he was discriminatorily disciplined. This claim about allegedly misusing parking privileges will not be dismissed, but the insubordina-

tion incident will not be considered, since it is outside the Red Book. The parking lot incident was witnessed by the shop steward, who said he would grieve it, but apparently never did. Although it does not necessarily support an inference of discrimination, it certainly shows bad faith on the part of the union man, so the claim against the union will not be dismissed.

Willie Benford did not testify on his claim against the union, so it will be dismissed.

Samuel Bragg was not allowed to testify because his claims arose prior to the statute of limitations.

Milan White was discharged for using threatening language to a foreman. At his deposition, he only complained about the discharge—he had no complaints about the union's handling of his grievance. In fact, he said that grievance man Jim Barone did a good job on it, and it went to the fourth step. The incident was precipitated by the foreman verbally abusing White. Such abuse was similarly heaped on whites by this foreman. White returned the threats and armed himself with a board, but never menaced the foreman with it. In the absence of record testimony on disparity, this claim of discriminatory discipline must be dismissed.

James McKithen was deposed on his efforts to transfer. The application for the apprentice program will not be dismissed as it is part of the retained class claim, but the 1970 transfer claim will be. In his deposition, McKithen stated that he filed applications to transfer to the Rolling or Sheet and Tin divisions. He went back repeatedly over a two-month period and was told that there were no openings. Since there is no evidence from which the Court may infer that this was an incident of disparate treatment, this claim will be dismissed.

Roosevelt Edwards has two main complaints—both stemming from the same incident. The claim against USS of disciplining him for refusing to accept a discriminatory work assignment will not be dismissed. The claim against the union will be dismissed, since the only evidence shows, not

that the union failed to process the grievance, but merely that Edwards had not been informed of its progress. The deposition testimony reveals that the grievance man decided to file the grievance and pursued it even in the face of non-cooperation from the foreman, who kept "losing" the form. Edwards contends that the union representative should have kept him informed. There is no evidence raising any inference that there was any bad faith or this failure was based on race.

Frank Lundy did not testify in his deposition on one Red Book claim, that of transfer. That claim will be dismissed. He further testified that he had no complaints regarding grievance processing by the union, which requires that claim to be dismissed also. His initial assignment claim, from 1955, is time-barred. Finally, Lundy's claims of discriminatory testing which date back to 1960 and 1963 are also beyond the statute of limitations.

Roy Wyatt was assigned to the Masonry department in 1955. This claim is time-barred. In 1963, he transferred to metallurgy, but three months later was required to take a test. This claim must similarly be dismissed, as it cannot be a basis of liability. Wyatt asserts a claim against the union on this issue as well, which cannot be maintained in light of the statute of limitations. The transfer to the electric furnace was denied. This was when the furnace was first opened. Therefore this claim will be retained along with the class claim.

Irvin Moore was assigned to Masonry in 1964 and encountered a bureaucratic morass at the personnel office. However, this claim is barred by the statute of limitations and will be dismissed. The claim of discrimination in testing will be retained with the class claim.

Emanuel S. Edmundson testified at trial regarding his attempts to get work at Fairless in 1955, 1956, 1958 and other unspecified dates up until his hire in 1966. Since these incidents, including his hiring, are time-barred, this claim will be dismissed. The claims which he makes as to transfer to crafts, overtime and interim job assignment are not to be dismissed at this time. The union claim will also not be dismissed. Edmundson had taken his complaint to his union representative, who refused to intercede. The next morning he went to James Costa, the union president, who said that his complaint would be taken care of, but it still was not. This does not show that the refusal to intercede had necessarily any relation to Edmundson's race, but it does indicate bad faith on both union officers' parts.

Jeremiah E. Kauffman has made a claim of discrimination in initial assignment, which is clearly time-barred, as it occurred in 1953. The Court will also consider as time-barred his testimony regarding his experience in maintenance, since it also apparently occurred in the 1950's.[32] Finally, he testified that he was never approached to become a manager. The Court will consider that testimony as part of the class claim on management.

Robert J. Garrison was hired in 1960, so his claim on initial assignment is outside the statute of limitations. He testified to two incidents involving discipline, one in 1974 and one in 1975, which do establish an inference of discrimination.

Andrew Jenkins was hired in 1963. Therefore, his initial assignment claim is time-barred. He testified that he also was not asked to be a vicing foreman. This will be treated along with the class claim. Since he did not testify about the union, that claim will be dismissed.

George A. Smith testified on number of issues—his initial assignment, his attempt to become a weigher, his attempt to get into management—which will not be dismissed. He also complained that his grievance man said that no grievance could be filed on his failure to get a salaried job, as this was not a contract right. There is no evidence that a white was or would have

---

32. At N.T. 4095, he testified, "This was at the early part of the shop where all of these jobs had not been filled . . ."

been treated differently or that this was anything other than a good-faith response. Therefore, the claim will be dismissed.

Charles Moseby's contention that he was discriminatorily kept out of management will be retained with the class claim. However, his claim on overtime and union representation appear to be general complaints, based on general unfairness rather than race. He testified that the men with more seniority do not get their due privileges in that regard and that the grievance man favors junior employees. This does not make out a claim of race discrimination.

Francis J. Meggett made two claims at trial. He first claims his initial assignment was discriminatory, but that cannot serve as a basis of liability, as it occurred in 1953. His second claim, discrimination in transfer, arose in 1954 and is time-barred.

Robert L. Harris's claims are similarly barred. He testified that he was initially assigned in 1953 and attempted to transfer in 1962.

Hudson Williams testified that he was not hired at first, which does not reach the prima facie level of proof of hiring discrimination. His claim of discriminatory recall in the apprenticeship program will be retained. The complaint about union representation will be dismissed because it does not raise an inference of bad faith or discrimination. He testified that the union man had told him that he did not need to grieve his recall because some other employee had already raised the issue and had lost. He did not describe his transfer attempts to the Rod mill and the Wire mill other than to state that they were denied. These claims will also be dismissed for failure of proof. The testing claim will be considered with the class.

William Roberts' initial assignment claim arose in 1953, and must be dismissed as time-barred. His claim of discrimination in transfer to Galvanizing in 1968 constitutes a prima facie case. He did not testify about the union, so that claim is dismissed for lack of proof.

George Williams' claims of initial assignment discrimination in 1954, disparity in transfer in 1954 and delayed promotion in 1954 are dismissed as time-barred. Further, his testimony of how he was harassed was related to a time period near his hiring, so it must be considered similarly barred.

Benjamin Williams was hired in 1953, so his assignment claim is time-barred. However, the complaint regarding transfer to Galvanizing will not be dismissed. He did not testify on the Red Book issue of harassment, which will be dismissed.

Robert Wiggins, assigned in 1955, was rejected in his attempt to transfer to the open hearth in 1959. This transfer claim is time-barred, as is his 1960 complaint of rejection for the Sintering plant first crew. These claims will all be dismissed. His 1955 claim of discrimination in training is also stale, as is the complaint about the union's handling of the grievance.

Carl K. Smith, Jr. was hired in 1964, which means that the Court must dismiss his initial assignment claim. His 1968 transfer claim will be retained, as will be the claims based on his failure to get the crane job, the disciplines for refusing temporary move-ups, and denial of vacation changes.

James A. Williams complained of discrimination in transfers in 1957, 1959 and 1961. These claims are barred by the statute of limitations. He did not testify as to a denial of housing, which results in dismissal of that claim.

John T. Keene's deposition, regarding a 1953 transfer attempt and the union's alleged inaction, was struck as being time-barred.

Leroy Faucette's initial assignment complaint arose in 1964, and thus is time-barred, as is his claim from his 1951 attempt to be hired. The harassment testimony is not placed in time except by the Red Book, which states that it took place during the height of civil rights activity in the South. This would mean that it occurred in the early 1960's and is now a stale claim.

Arthur McKeithen was assigned to the open hearth in 1968, so this claim will be considered with the class claim. However, the Red Book issue of "racist atmosphere" must fail because McKeithen did not complain of anything like this in his deposition. To the contrary, he repeatedly said that he enjoyed working in the open hearth.

Hezekiah McKinney was hired into the open hearth in 1969, so his complaint of initial assignment discrimination is appropriate. The complaints based on fellow workers' remarks will be dismissed for the legal reasons analyzed in the discussion on Alphonso Overstreet, *supra.*

Willie Noble testified about his experiences coming to Fairless after being recruited in Alabama. Since plaintiffs have withdrawn the class claims on housing of the Birmingham recruits, the claim as to "privileges of employment" will be dismissed. The claim of retaliation is borne out by the testimony of Eddie Williams. Both testified that they were given "special assignments" after they complained about their initial jobs. Other than this, Noble did not testify about harassment and did not discuss any alleged racist remarks. Those two claims will be dismissed, as will the claim against the union, for lack of any testimony. The Court will not dismiss those assertions of discrimination in initial assignment, transfer and access to crafts.

Hurbert Leonard's assignment claim and complaint of harassment and discriminatory discipline will not be dismissed. The union discrimination claim will be denied, as the union representative's failure to process his grievance does not raise an inference of bad faith or discrimination. There was no testimony regarding the Civil Rights committee or discrimination in pay, so those Red Book claims will be dismissed. The claims of "racist atmosphere" and "consent decree" will be dismissed for the legal reasons discussed under these class claims, *supra.*

Arwilda Green was hired in 1974, so she may assert her claim of discriminatory assignment with the class. Her transfer claim fails because she admits that she cannot win a bid because of her low seniority.

See *Teamsters, supra.* The Court cannot find any record testimony which would support the vague Red Book claims of discrimination in "terms and conditions of employment" and "privileges of employment." Therefore, these will be dismissed. The only union activity reported in the deposition is Green's contention that complaints aired at meetings are reported disfavorably to management. This testimony raises no inference of discrimination and the claim will be dismissed.

Marvin Lee Hayes was assigned to be a janitor in 1973. His assignment claim will therefore be retained with the class. However, the claims of harassment and discrimination in privileges will be dismissed because there is no evidence that white employees received any different treatment.

Ivory Jones' claim of discriminatory testing will be retained with the class claim. His transfer claim will also not be dismissed, as it shows a prima facie case. However, the Court can find no evidence to support a claim of discrimination in privileges of employment, so that claim will be dismissed. The issue of "racially discriminatory atmosphere" will be dismissed for the legal reasons enunciated in the discussion of the class claim.

Harold Derry was assigned to the open hearth in 1968. His assignment claim will therefore be considered with the class as to liability under § 1981. The three remaining claims in the Red Book appear to deal with his belief that a certain foreman assigned harder or dirtier work to blacks than to whites. However, his testimony reveals that whites were assigned the same unpleasant work as well. The Court cannot infer from these acts an element of discrimination which would meet the prima facie burden, so these claims will be dismissed.

Artis Graham's claims of assignment and testing discrimination will be retained with the class claims. His other three claims in the Red Book deal with two incidents of harassment by fellow employees. The first occurred soon after his 1971 hiring, as he was discussing his desire to be a welder. A white welder told him that blacks could not

become welders. Such an isolated comment by a fellow employee cannot be held against the company, especially when there is no evidence that the company was aware of it. See *Croker, supra.* The second complaint of harassment arose when Graham was awarded the oiler's job on a bid. His white co-workers on the new job challenged the legality of the bid. So, in order to end the debate, the foreman had the job re-bid, and it again was awarded to Graham. There is evidence of the foreman's fairness and concern for Graham, which does not form a bases for USS' liability. Here, the acts of fellow employees which might be viewed as racist were properly cut off by the foreman. Therefore, USS in this case acted according to the law and is not liable for the attitudes of its fellow employees.

Israel Aikens requested a transfer in 1972. He filed a written application and the interviewer said that he would be notified in a week to ten days. He never heard and did not act further. In light of the lack of evidence of whites receiving different treatment, this will be dismissed.

James Brooks' testimony on his transfer attempt in 1972 constitutes a prima facie case. However, his union claim fails because there is no evidence that a claim was handled improperly. He complained to his grievance man but did not ask him to file a grievance. In his second deposition, he stated that every grievance he has filed has been executed. Any failure to file, he testified, was his own fault. This does not state a claim against the union.

Ivory Lewis stated at his deposition that in 1976 he was unable to bid on a truck driver's job because it was not posted. There is no evidence to support an inference of discrimination here. Later, he went to his grievance man to find out if the job had been awarded by bidding, but he decided not to press the issue. This claim is dismissed as having no factual basis to show bad faith or discrimination.

Alfred Simpson's Red Book summary contains three claims which are time-barred—his 1957 attempt to get a scale repairman's job, his resulting complaint to the union, and his attempt to rebid the job in 1958. However, his 1973 claim of discrimination when he attempted to get a painter's job meets the prima facie burden.

Irvin Davis testified about his problems with the apprentice program. His claim of harassment and racist remarks by foremen will be retained, since his grievance put the company on notice. His claim that the company failed to promote him will be dismissed, because there is no evidentiary basis of disparity. Furthermore, the claim of union discrimination will also be dismissed because the union processed his grievance to the fourth step. This does not form a basis for inferring bad faith.

William Spicer asserted three claims in his deposition testimony, one of which will be denied. That claim of union discrimination is based on a single contact with a grievance man, which did not involve the filing of a grievance. The grievance officer said that he would investigate the complaint but never reported back to Spicer. Since this does not form a basis to infer bad faith or discrimination, this claim will be dismissed.

General Sanders wanted to transfer to the USS plant at Trenton, which he finally was able to do after being initially denied. This claim will be dismissed for two reasons. First, the Trenton plant is beyond the scope of this litigation. Second, even if this employment decision was made by the Fairless office, there is no evidence that white workers were allowed to so transfer.

In addition to these class members who testified at trial, there are three witnesses in this case who have actions independent of the class. First, Curtis Worthy has filed his own action, which is being tried with this case. Also, the Court must consider the claims of the named class representatives, Moses Dickerson and Eddie Williams. Those cases will be discussed below.

Curtis Worthy is entitled to have his evidence reviewed in two ways. First, he is a member of the class. Second, he filed an individual action, *Worthy v. USS*, C.A. No. 74–2689. His own claims arise under both

Title VII and § 1981. The defendants involved in this action are the same. This case is also only being tried as to liability at this stage.

The Court has decided that at this time Worthy's claim of disparate discipline should not be dismissed. He was suspended for a total of 10 days and was not discharged solely because he demoted out of the craneman's job. The testimony and documents submitted by the plaintiff show that whites were not so treated under similar circumstances.

The claim against the union is premised on the fact that union representatives did not attempt to fight this discipline. They told him that there was nothing they could do. One grievance man advised him to plead for leniency. This conduct indicates that the union had evaluated his case and had decided that a grievance would not succeed. Under *Vaca*, they do not have to contest each case. Therefore, the claim against the union will be dismissed.

Moses Dickerson first came into contact with Fairless Works personnel on October 21, 1969 in Birmingham, Alabama. Bruce Glen, a management employee in the Fairless personnel office, was recruiting workers for the plant in conjunction with advertising being done in the Alabama newspapers. During their conversation, Glen assured him that welding positions were available in Pennsylvania. On his application, Dickerson noted the varied welding jobs he had held. He also gave Glen a copy of his vocational school certificate. He was given a preliminary physical, which he passed. He was then given travel money and a bus ticket to Trenton.

Dickerson claims that USS promised financial help with family relocation. Since this testimony was not corroborated by the other Birmingham witnesses, the Court will not credit it. That claim is dismissed.

When Dickerson arrived in Trenton, he was taken to the YMCA, where the recruits were to stay. Since the evidence shows

only that all recruits stayed there, regardless of race, any claim regarding housing will be dismissed.

After a physical at Fairless, he was told that he did not pass his physical because of a bad back. He was told that he could take a janitorial job or go back to Alabama. The Court does not find, from this evidence, that any inference of discrimination may be drawn as to the failure to make him a welder. However, the Court does find an inference of discrimination, because of the class-wide evidence, that he was discriminatorily assigned to be a janitor instead of to other non-lifting jobs in white clusters such as plant guard. Plaintiffs have argued that Dickerson's assignment to the laborer's work was discriminatory. In view of the fact that no other black "Birmingham hire" was so treated, but sent to non-welding work, there is no reason to assume that USS had to make up such a story merely to keep Dickerson out of a welding job. This Court believes that the diagnosis provides a "business necessity" for not hiring Dickerson as a welder, and would rebut the prima facie case. However, in light of plaintiffs' right to have the last word under *Albemarle Paper*, the claim of discriminatory denial of a crafts job will not be dismissed at this time. The assignment claim will be retained because of the class-wide evidence. Plaintiffs will be given an opportunity to show that Dickerson did not, in fact have a bad back and that this reason was merely a pretext for discrimination. They will have to present more evidence than Dickerson's own testimony that he has never had problems with his back. The Court finds such testimony self-serving and will not accord it any weight.[33]

Dickerson was classified as a "hard-core" unemployable, in spite of his long work record. He was given a longer probationary period, but did not receive the promised training. Discrimination can clearly be inferred from this evidence, so this claim will not be dismissed.

33. Dickerson's transfer claim will similarly be retained, since the company contends that his physical impairment kept him in the janitorial unit. Plaintiffs will be allowed to defend Dickerson's qualifications for other jobs.

Dickerson complains that he was disciplined because he had filed complaints with outside authorities. The company has defended this charge on cross-examination by attempting to show that Dickerson was properly disciplined for frequent absenteeism and drinking before and on the job. Since plaintiffs have established an inference of discriminatory treatment, by showing a flurry of disciplines [34] imposed on Dickerson immediately after his claims were publicized, this claim will not now be dismissed, despite doubts raised by USS' cross-examination.

In June, 1973, Dickerson received a discipline slip for failure to report off, and was given five days' suspension subject to discharge. The hearing was short, because the superintendent refused to hear his defenses. However unfair the Court may believe this behavior was, it does not raise an inference of discrimination in absence of any indication that whites fared better in this procedure.

In July of 1973, Dickerson received another discipline slip which he alleges was discriminatory.[35] Although the circumstances surrounding this incident demonstrate again that Dickerson was treated unfairly, this does not rise to the level of discrimination. *Chatman v. U.S. Steel Corp.*, 425 F.Supp. 753 (N.D.Calif.1977). He was again subject to discharge and, on advice of his union representative, resigned rather than be fired. Plaintiffs claim that in light of his prior treatment by the superintendent, this was a "constructive discharge." Even if this is true, since the Court has decided this prior treatment was not proven as race discrimination, this claim must also be dismissed.

Finally, Dickerson complains that the union discriminatorily failed to press his claims at the discharge hearing. The union man sat silent through most of the proceedings, but made a plea for leniency. This

charge does not meet the *Vaca* standard of bad faith and must be dismissed. Second, Dickerson contends that his grievance man should not have urged him to quit, but should have prosecuted his claim instead. This Court finds that, in light of the prior discharge proceedings regarding Dickerson, that the union's activity certainly did not constitute bad faith but may have seemed to be the only advice he could give.

Eddie Williams is the other named class representative. The Court found, in listening to this witness' testimony at trial, he exaggerated many of the incidents that occurred, especially as the situation in his life worsened. Therefore, the Court has discounted parts of his testimony as incredible.

Williams was hired in October, 1969. He was recruited in Birmingham by Bruce Glen. Prior to his work at Fairless, he had done welding work at companies in Alabama, but had never performed any maintenance welding. He had taken a welding training course, which he did not complete. Williams claims that he was guaranteed a welding job in the Birmingham interview. As the other recruits, Moses Dickerson and Willie Noble, have testified only that they were assured that openings were available if they were qualified, the Court does not believe this testimony. The Court finds no basis for liability as to the Birmingham recruiting. The housing claim will also be dismissed, for lack of competent evidence that Williams was treated any differently because of his race. Williams himself testified that the YMCA was in a "mixed" neighborhood. Williams also testified that he was promised transportation assistance to and from the plant. This evidence is borne out by the testimony of the other recruits. Again in the absence of any evidence of disparity, this claim will be dismissed.

---

**34.** A newspaper article appeared on March 19, 1970. Dickerson received discipline slips on March 19, 20 and 21. Another article appeared on July 31, with slips issued on July 31, August 10, and 25.

**35.** Dickerson was found lying down in one of the areas where he was cleaning. He claimed that he was dizzy because of a blood disease he had, but the foreman issued the discipline slip in spite of his awareness of the illness.

When he was hired at Fairless, he was assigned to the open hearth as a laborer. Williams will benefit from the inferences raised on the class claims as to assignment and access to crafts. Therefore, these claims will not be dismissed, since the Court infers that he was denied the opportunity to take a first welding test for a long time, as were other class members, because of his race. Furthermore, even if he was not qualified to be a welder, the Court infers that he was assigned to the open hearth, one of plaintiffs' five "undesirable" clusters, instead of to a laborer's job in another unit, because he was black.

Williams corroborated the testimony of Willie Noble about harassment, which was the giving of "special assignments." Both men complained that their foreman gave them work different from the others in their department, after they complained about their initial assignment. The Court has therefore decided not to dismiss this claim.

After one and a half years in the open hearth, continually requesting a welder's job, he put in a request for transfer. He transferred to the general services department, but found that job more unpleasant than his previous one and transferred back. He claims that he was only allowed to transfer because of publicity of his claim in local newspapers. However, this is the only time that he tried for jobs other than welder. His claim of transfer discrimination to non-crafts jobs will be denied because no inference of disparity has been raised by the facts here.

Williams was finally allowed to take a welder's test in the spring of 1970, which he did not pass. He claims that this was a different test than that given to white applicants. The Court does not find that testimony believable. There is no evidence to support Williams' claims that he passed the test, since his welding experience was very limited in scope. His jobs both before and after his Fairless employment involved the simplest type of welding. He admitted on cross-examination that he was not experienced in acetylene welding. Based on this evidence and the witness' lack of credibility, the Court does not find that he was given a "rigged" test.

Williams went to the general plant superintendent with his contention that the test was "rigged". Although the superintendent offered no assistance at the meeting, he was later scheduled for a second welder's test, which was rescheduled a number of times. Williams admitted on cross-examination that he refused to take the test a second time. No separate liability arises because of this second test, since he refused to take it. It does not however rebut his claim of discrimination in access to crafts, since he had to repeatedly file requests before he was even allowed to take the test once.

Williams complains that after the publicity of his race discrimination claim, he started being harassed on the job. The testimony on this claim is vague and lacks detail. Since the Court has found Williams to exaggerate many of his problems, this testimony cannot be credited nor can it serve as a basis of liability against Steel.

The Court allowed Williams to testify in support of the class claim against the union, even though he had not raised any individual claim. He and Dickerson told their problems to a union representative to the plant's Civil Rights Committee. The man told him that he could not help him. This evidence does not significantly bolster a pattern and practice claim, since it does not show union discrimination, but merely ineffectiveness.

Williams, like Dickerson, received a number of discipline slips. He claims that they were related to the March, 1970 publicity of his complaints. However, plaintiffs did not put into evidence as part of their case any of the discipline slips to support this allegation. All the Court has before it is some generalized and vague testimony from the witness. In view of this slim record, this claim will be dismissed.

Finally, plaintiffs claim that Williams was constructively discharged because of his harassment and discriminatory assignment. Since most of this claim is not supported by evidence of discrimination, as

noted before, this charge cannot be sustained. They also contend that he was harassed after he left USS and that bad recommendations caused him to be fired from his next job. He was fired from his job at Southeastern Metal Company because of his failure to do his job properly. The Court does not find a causal link between his negative recommendation from Fairless, and his firing, which occurred much later.

## ORDER

AND NOW, to wit, this 25th day of July, 1977, in accordance with the reasons set forth in the accompanying memorandum, it is hereby Ordered that:

1. Defendant USS' motion to decertify the class is DENIED;

2. Defendant union's motions under Fed.R.Civ.P. 12(b) and 56 are DENIED;

3. Defendant USS' motion to dismiss under Rule 41(b) is GRANTED as to the following class claims only:
   a. Transfer (except to new facilities),
   b. Harassment, discipline and discharge,
   c. Hiring,
   d. Racially discriminatory atmosphere,
   e. Implementation of consent decree;

4. Defendant union's motion under Rule 41(b) is GRANTED as to the following class claims only:
   a. Transfer (except to new facilities)
   b. Harassment, discipline and discharge,
   c. Grievance processing;

5. Defendant USS' motion under Rule 41(b) is GRANTED only as to the following individuals' claim:
   a. Alphonso Overstreet (except discipline)
   b. Benjamin Evans
   c. Jack Miller, Jr.
   d. Manfred James (except carpentry shop claim)
   e. Edison Williams (except transfer)
   f. Warren Hallback (except training and discipline)
   g. Alan J. Edwards (except discipline)
   h. Lieutenant W. White
   i. Ananias Mitchell (except parking lot discipline)
   j. Samuel Bragg
   k. Milan White
   l. James McKithen (except apprentice program)
   m. Frank Lundy
   n. Roy Wyatt (except transfer)
   o. Irvin Moore (except testing)
   p. Emanuel Edmondson (except transfer)
   q. Jeremiah Kauffman (except management)
   r. Robert J. Garrison (except discipline)
   s. Andrew Jenkins (except management)
   t. Charles Moseby (except management)
   u. Francis J. Meggett
   v. Robert L. Harris
   w. Hudson Williams (except recall and testing)
   x. William Roberts (except transfer)
   y. George Williams
   z. Benjamin Williams (except transfer)
   aa. Robert Wiggins
   bb. Carl K. Smith (only as to initial assignment)
   cc. James A. Williams
   dd. John T. Keene
   ee. Leroy Faucette
   ff. Arthur T. McKeithen (except initial assignment)
   gg. Hezekial McKinney (except initial assignment)
   hh. Willie Noble (except assignment, transfer, crafts)
   ii. Hubert Leonard (except assignment, harassment, discipline)
   jj. Arwilda Green (except assignment)
   kk. Marvin Lee Hayes (except assignment)
   ll. Ivory Jones (except transfer and testing)
   mm. Harold Derry (except assignment)
   nn. Artis Graham (except assignment and testing)
   oo. Israel Aikens
   pp. Ivory Lewis
   qq. Alfred B. Simpson (except transfer to paint shop)

rr. Irvin Davis (except harassment and racist remarks)

ss. General Sanders

tt. Moses Dickerson (except assignment, discipline, probationary period, transfer)

uu. Eddie Williams (except assignment, access to crafts, harassment)

6. Defendant union's Rule 41(b) motion will be granted only as to the following individuals' claims:

a. John Davis

b. James Rembert

c. Manfred James

d. Benjamin Evans .

e. Jack Miller, Jr.

f. Edison Williams

g. Warren Hallback

h. Alan J. Edwards

i. Lieutenant W. White

j. Ananias Mitchell

k. Willie Benford

l. Samuel Bragg

m. Roosevelt Edwards

n. Frank Lundy

o. Roy Wyatt

p. Andrew Jenkins

q. George A. Smith

r. Charles Moseby

s. Hudson Williams

t. William Roberts

u. Robert Wiggins

v. John T. Keene

w. Willie Noble

x. Arwilda Green

y. James Brooks

z. Alfred B. Simpson

aa. Irvin Davis

bb. William Spicer

cc. Curtis Worthy

dd. Moses Dickerson;

7. Defendants' motions to strike, made orally at the close of trial on July 11, 1977, are DENIED;

8. Plaintiffs' motion to admit self-authenticating documents into evidence is GRANTED only as to those presented to the Court during trial or filed with the Clerk of the Court, including those documents presented with plaintiffs' 41(b) brief. It is otherwise DENIED.

9. Defendant union's motion to strike evidence and testimony is GRANTED only as to Appendix C of defendants' motion. It is otherwise DENIED.

AND IT IS SO ORDERED.